TRAYLOR ENGINEERING & MFG. CO. v. LEDERER, Collector of Internal Revenue.

(Circuit Court of Appeals, Third Circuit. March 14, 1921.)

No. 2612.

1. Internal revenue ⊙══9—Association to grubstake corporation in securing munitions contract held not taxable "person."

A corporation and two individuals, who had advanced money to it to apply on the expenses of a trip by its president to England to secure a munitions contract, and who gave the bond required to secure the contract, under an agreement whereby they were to receive a proportion of the profits of the corporation received from the manufacture of munitions under the contract, but who had no control over such manufacture, merely agreed to grubstake the corporation and did not form a partnership with it in the manufacture, so that the corporation, and not the association of the three, was the taxable person, within munition manufacturer's tax provision of Act Sept. 8, 1916, § 300, which defines "person" as including partnerships, corporations, and associations.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Person.]

2. Internal revenue ⊙══9—Corporation liable for munitions tax, regardless of disposition made of profits.

A corporation manufacturing munitions is liable for the munition manufacturer's tax on all profits realized by the manufacture and sale of such munitions, even though, in pursuance of a previous agreement, it distributed a portion of such profits to two individuals, who had advanced money to enable it to secure the contract.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action by the Traylor Engineering & Manufacturing Company against Ephraim Lederer, Collector of Internal Revenue for the First Collection District of Pennsylvania. Judgment for defendant (266 Fed. 583), and plaintiff brings error. Affirmed.

F. B. Bracken, of Philadelphia, Pa., for plaintiff in error.

Charles D. McAvoy, U. S. Atty., and Robert J. Sterrett, Sp. Asst. U. S. Atty., both of Philadelphia, Pa., and Carl Mapes, of Washington, D. C., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

⊙══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

WOOLLEY, Circuit Judge. The plaintiff corporation brought this action to recover from the defendant, Collector of Internal Revenue, a sum it had paid as an excise tax assessed against it as a munitions manufacturer, under the Act of Congress of September 8, 1916 (39 Stat. 756).

As the controversy is quite unusual, we shall make a preliminary statement of the case, omitting for the moment one or two important features but presenting enough to show the question involved, the law out of which it arose, the contentions of the parties, the judgment of the court, and the reasoning that moved it to its conclusion.

The plaintiff corporation was engaged in the business of manufacturing machinery at Allentown, Pennsylvania. Late in 1914, S. W. Traylor, its president, indicated to Harry C. Trexler of Allentown, and James Phillips, Jr., of New York, his intention of going abroad in search of munitions contracts for his company. Trexler contributed about $600 and Phillips about $400 to the expenses of the trip upon an oral understanding that in the event a contract were secured and from it profits were earned, they should share in the profits in the proportion their contributions should bear to the expenses of the trip, estimated at about $2,000. In addition Phillips gave Traylor a letter of introduction to a man of position in London, which Traylor used in gaining access to the British War Office.

Traylor was successful, and in January, 1915, the plaintiff entered into a contract with the Government of Great Britain for the manufacture of shells.

The contract provided for payment by the British Government to the plaintiff of $1,000,000 in advance of shell deliveries, on condition, however, that the plaintiff furnish a bond in the same amount to insure the return of the money in the event of the plaintiff's failure to make deliveries in accordance with the terms of the contract. Satisfactory bonds were furnished by surety companies on the strength of indemnity agreements entered into by the plaintiff with Trexler and Phillips, both men of influence and wealth.

Up to this time the relations of the parties, in so far as they were contractual, were wholly informal. After these transactions had been concluded,—that is, after the contract had been procured, the requisite indemnity bonds furnished, and an initial payment of $1,000,-000 had been or was ready to be made,—the plaintiff corporation and Trexler and Phillips entered into their first writing. This was an agreement dated February 17, 1915, wherein the parties recited the transactions done and completed, including Traylor's trip abroad, Trexler's and Phillips' contribution to the expenses thereof, the contract with the Government of Great Britain secured by the plaintiff, the joinder of Trexler and Phillips with the plaintiff in the execution of bonds in connection with the contract, and their agreement with reference to a division of profits when earned. This contract contained, so far as we can discern, no new undertaking on the part of Trexler and Phillips or anything more definite than that they should "give such further assistance by their advice, credit and influence as

may be in their power to the end that the contract may be carried out to the mutual advantage of all concerned." Nor does it contain, so far as we can find, any new obligation on the part of the plaintiff corporation. The purpose of the contract, it seems, was to record past transactions and the understanding of the parties with reference to the ascertainment and division of profits which were expected to grow out of them. To this end it was agreed that the plaintiff corporation should receive its manufacturing cost, plus ten per cent. for its services in the manufacture of the products covered by the contract, to be determined in a manner outlined, and thereafter—

"When the net profits accruing from said contract * * * shall have reached the sum of five hundred thousand dollars ($500,000) and that amount shall be deposited, all profits over and above such sum shall be divided monthly among the parties hereto in the proportions hereinafter specified and upon the completion of the contract and the winding up of the business covered by this agreement, all net profits shall be divided between the parties hereto as follows:

"James Phillips, Jr., twenty-five per cent. (25%); Harry C. Trexler, thirty-three and one-third per cent. (33 1/3 %); Traylor Engineering & Manufacturing Company, forty-one and two-thirds per cent. (41 2/3 %)."

After entering into this writing, Trexler and Phillips contributed no capital toward the contract and did nothing toward its performance, except in one instance when Trexler obtained from the Bethlehem Steel Company permission to test the shells on its proving grounds.

The contract was fully performed prior to February 16, 1916. On that day the plaintiff made settlement of profits with Trexler and Phillips, substantially as orally agreed upon at the beginning and precisely, we assume, as provided in the written contract later entered into, wherein it paid Trexler $650,000 and Phillips $487,500—something more than $1,000 for each dollar invested—and retained the balance.

On September 8, 1916, the Congress enacted the "Munition Manufacturers' Tax Law." 39 Stat. 780. Those of its provisions pertinent to this case are the following:

"Section 300. That when used in this title—

"The term 'person' includes partnerships, corporations, and associations. " * * * The first taxable year shall be the twelve months ending December thirty-first, nineteen hundred and sixteen.

"Section 301. That every person manufacturing gunpowder and other explosives * * * shall pay for each taxable year, in addition to the income tax imposed by Title I, *an excise tax* of twelve and one-half per centum *upon the entire net profits actually received or accrued* for said year *from the sale or disposition* of such articles manufactured within the United States.

"Section 302. That in computing *net profits* * * * there shall be allowed as deductions from the gross amount *received or accrued* for the taxable year *from the sale or disposition* of such articles manufactured within the United States, the following items: * * * *

"(b) Running expenses including rentals, cost of repairs and maintenance, heat, power, insurance, management, salaries, and wages."

The plaintiff corporation in due course made a return of its profits in the manufacture of munitions for the year 1916, properly omitting, it is conceded, profits on deliveries under the contract made prior to

271 F.—26

January 1, 1916. In ascertaining the amount due under the statute, it deducted as "running expenses" of its business the portions of profits earned in 1916 it had paid Trexler and Phillips. It then paid the tax as thus computed.

Subsequently the Commissioner of Internal Revenue, regarding the plaintiff corporation, Trexler and Phillips as copartners in respect to the munitions contract, held that the payments to them were in distribution of partnership profits. He therefore disallowed the plaintiff's deduction of profits paid Trexler and Phillips as "running expenses" and made an additional assessment of $46,706.97. The plaintiff, having paid this sum under protest, and its claim for refund having been rejected, brought this suit to recover the same. Few of the facts being in dispute, a jury was waived and the case was tried to the court.

At the trial the plaintiff took the position that Trexler and Phillips had rendered the plaintiff services in procuring the contract between it and the Government of Great Britain by contributing to the expenses of Traylor's trip abroad and by becoming indemnitors with the plaintiff on the required bond; that compensation to Trexler and Phillips for these services was measured by shares in the profits earned under the contract, and that, being compensation for services rendered, it thereby necessarily became an expense in the manufacture of shells deductible under the statutory heading of "running expenses," conformably with a ruling of the Commissioner of Internal Revenue published February 24, 1917. There the Commissioner said:

"Commissions or bonuses which were paid prior to January 1, 1916, for obtaining contracts for munitions and which contracts were fulfilled and deliveries made and the munitions paid for after January 1, 1916, would be allowable deductions (in ascertaining net profits for the purpose of the tax) as such necessary expenses as are contemplated by section 302 of the Act referred to."

Amplifying its position a little further, it is to be noted that the plaintiff is not claiming as an allowable deduction the money advanced by Trexler and Phillips in aid of its effort to obtain a munitions contract, but it is claiming as an allowable deduction from gross receipts, in the process of ascertaining taxable net profits, profits made on a munitions contract and distributed to others; this on the theory that "net profits actually received or accrued" from the sale of munitions —intended by the statute as the basis of tax assessment—are not all the profits that grow out of or accrue from the manufacture of munitions by the "person" described in the statute, but are only those profits which are actually received by and which actually accrue to that "person" in his own right; and where, as here, profits are by previous arrangement divided, then only those profits which remain and which constitute the share of the "person manufacturing" are subject to the munitions excise tax.

The defendant, very properly we think, declined to adopt the theory of the Commissioner of Internal Revenue that the three parties—one of whom was a corporation—constituted a partnership within the terms

of the statute, and took the position that it did not matter whether the articles of agreement entered into by the three constituted them a partnership, a corporation, a joint stock company, or any particular kind of association or organization, in view of the found fact that they had joined themselves together in a joint enterprise of manufacturing munitions for their mutual benefit and had thus constituted themselves a taxable "person" within the meaning of the law.

The learned trial judge found as a fact that "the Traylor Company, Phillips and Trexler were associated together in the manufacture of munitions for the Government of, Great Britain under the said contract" and, disregarding the theory of partnership or association, found against the plaintiff on the ground that the parties had embarked in a joint adventure in the manufacture of munitions for the Government of Great Britain and that the payments made to Trexler and Phillips were not expenses of the business, deductible as running expenses in ascertaining taxable net profits, but were distributions of profits arising from the adventure among those who had engaged in it. Accordingly judgment was entered for the defendant and the plaintiff sued out this writ of error.

Thus it appears that a correct decision of this case rests on the legal relation of the parties. The question of just what that relation was turns, we think, on a distinction, to be carefully drawn, between the case as pleaded and the case as proved.

The plaintiff in its statement of claim frankly admits that the contract when procured was solely between itself and the Government of Great Britain, and that the contract was wholly performed by it at its own expense. The plaintiff further admits that it procured the contract, but, it maintains, it procured it with the aid of Trexler and Phillips in contributing toward the expenses of the trip abroad and in becoming indemnitors in the requisite surety obligations. It contends, therefore, that this aid constituted "services rendered" by Trexler and Phillips "in connection with the procurement of the said contract by plaintiff" and in consideration of these services the plaintiff agreed with Trexler and Phillips that "they should be paid a certain percentage of the profits, if any, which might be realized by the plaintiff from the performance of the said contract."

The plaintiff made certain the limited character of the services rendered by admitting that

"The said Trexler and Phillips performed no other services in connection with the procurement or performance of said contract except as herein above stated, did not contribute any sums of money whatever toward the performance of the said contract, and assumed no responsibility whatever in connection therewith except such liability as they incurred in connection with the above-mentioned guarantee."

In conclusion the plaintiff claimed the payment of profits to Trexler and Phillips as valid deductions from gross income for the purpose of determining taxable net income and demanded recovery accordingly.

This was the plaintiff's case as to the relation of the parties made by the pleadings.

The case on the evidence was made from the testimony of Traylor and Trexler. It was in substance as follows:

In December, 1914, Traylor had planned a trip abroad with the object of obtaining for his company a contract with the British Government for the manufacture of munitions. Such contracts were at the time just making their appearance. Traylor knew nothing about the manner of negotiating for them beyond the obvious necessity of being introduced to the proper authorities. With this in mind he asked Phillips for a letter of introduction to some one in England through whom he might reach the British War Office. One day at a railroad station Traylor happened to meet Trexler, a personal friend, and casually referred to his trip abroad and its object. Trexler became interested in the project, not in a business way just then, but merely through friendship with Traylor. Being anxious to go abroad with influence standing behind him and with good names which he could use as references for his corporation, Traylor arranged a meeting between the three and proposed to Trexler and Phillips that they "take a chance" on his expenses to Europe and promised, in return for their "services," that his company, if a contract were obtained, would divide profits, if any were made (after deducting costs, overhead, etc.), in the proportion their contributions bore to the expenses of the trip. This was agreed upon. Traylor went abroad with a letter of introduction from Phillips and, obtaining access to the British War Office, began negotiations. In these negotiations, while using Trexler's name as a reference for his corporation, neither Trexler nor Phillips participated. The contract was obtained, and it was obtained by Traylor alone. Up to this point the transaction was, we think, precisely what Trexler characterized it, namely, a "grubstake."

On the relation of the parties as developed by the testimony the learned trial judge, as we have said, found them engaged in a joint adventure in the manufacture of munitions for the Government of Great Britain. To this finding we subscribe if we may further define the adventure.

[1] In these transactions it is important to note there were two contracts. One was between the plaintiff corporation and the British Government, with which Trexler and Phillips had nothing to do. They did not procure it and they were not called upon to perform it. The other was between Trexler, Phillips and the plaintiff corporation, and was based upon the procuring of a contract by the plaintiff with the British Government and the earning of profits by the plaintiff after such contract had been procured. With this contract the Government of Great Britain had nothing to do. Under one munitions were to be made; under the other profits were to be distributed.

The contract between Trexler, Phillips and the plaintiff therefore had to do essentially with a speculative enterprise of hazard. This is evidenced by the fact that performance of this contract depended solely on the outcome of the other contract. In pursuance of its oral and wholly informal terms, Trexler and Phillips advanced inconsiderable sums of money toward the expenses of the one proposing to negotiate

a contract, and after the contract had been procured, they voluntarily became indemnitors upon the requisite bond. Any money returned to Trexler and Phillips for their advances on account of expenses and for their liability as indemnitors, manifestly was their reward for risking their credit and staking their money, first, on the chance of Traylor getting a contract abroad, and next, on the chance, if a contract were obtained, of the plaintiff making profits out of it. Failing in either, Trexler and Phillips would have wholly lost their stake, hence Trexler's quite accurate characterization of the contract as a "grubstake." Trexler had been engaged in the mining business and well knew the signification of that term. Thus it is evident that the interest of Trexler and Phillips was in the profits of the contract with the British Government, not in the contract itself. For this reason, we think, they and the plaintiff were not in any sense associated together in the manufacture of munitions for the British Government, but that the plaintiff corporation was alone the "person," within the terms of the statute, that was engaged in manufacturing munitions for that Government.

[2] The plaintiff proceeded to manufacture munitions under the contract. On their manufacture profits were made and were received, initially at least, by the plaintiff. What it did with such profits after creating them was its own affair. Fully realizing this, it had made a grubstake contract involving the division of anticipated profits. Upon earning profits, the plaintiff could of course do with them as it chose, and it chose by previous arrangement to give some of them to Trexler and Phillips. It was just between these two contracts—between the conclusion of one and the performance of the other, just after profits had been earned under one and just before they were distributed under the other—that, we think, the Munitions Tax Act entered. Right here the law spoke, saying:

"Every person manufacturing" munitions (and the only person manufacturing munitions here was the plaintiff corporation) "shall pay * * * an excise tax" (we apprehend for the privilege of engaging in the business of munitions manufacture) "upon the entire net profits actually received or accrued" (not to the "person manufacturing," but) from the sale and distribution of such articles manufactured." Section 301.

While the tax is leveled against the "person manufacturing" munitions, it is assessed against net profits arising "from the sale and distribution" of munitions manufactured, ascertained after allowing certain deductions which cover generally the cost of production, including running expenses.

The plaintiff's contract with the Government of Great Britain was the only one of the two contracts that the Munitions Act was concerned with, for it was only under this contract that munitions were made and profits earned. Of the two parties to that contract the plaintiff was the only one that made and sold munitions—the other bought them. As profits thus made constitute the taxable subject of the Act, evidently the tax is directed against the "person" producing them. If that person chose before creating profits to promise by a side-contract

to give or pay them to others when earned, then he could do so only after the Government had exacted the tax for the privilege of doing the particular business out of which he had made profits of this kind.

This we regard to be the true relation of the parties with its legal consequences, arising from two separate and distinct contracts made with reference to different subjects and for different purposes. As profits distributed under the side-contract in no way entered into the cost of manufacturing munitions under the main contract, we are of opinion that they cannot be regarded as an expense of manufacture deductible from the gross amount received from sales in ascertaining taxable net profits.

The judgment below is affirmed.