MOXA BUILDING COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53024.   Promulgated October 30, 1934.

*Spotswood D. Bowers, Esq.*, for the petitioner.
*Frank M. Thompson, Esq.*, for the respondent.

### OPINION.

SMITH: This is a proceeding for the redetermination of a deficiency in income tax for 1926 of $14,007.54.   The question in issue is the right of the petitioner to deduct from its gross income $102,000 representing amounts paid to certain individuals who had financed the operations of the petitioner.   Petitioner claims the deduction either as interest paid upon loans or as ordinary and necessary expenses in carrying on its business.

The petitioner was incorporated prior to April 9, 1926.   It had a capital stock, divided into 20 shares, 19 of which were owned by Robert B. Bowler and one by his secretary, Mary A. Pappert. Bowler was treasurer and secretary of the corporation.

Bowler was an investor in New York real estate.   Over a period of about 10 years he had organized many corporations similar to the petitioner and had always made it a point of having several such corporations organized and ready to take title to a parcel of property whenever a favorable opportunity to invest therein was presented. As a rule each corporation was availed of for only a single business venture.   The petitioner never engaged in any other venture than the one described below.

In April 1926 Bowler learned that the assets of the Manhattan Brass Co. were for sale by the trustees in liquidation of that company and that about $125,000 would be required to finance the deal. He also learned that there were two other persons contemplating the purchase of the property and that if he were to acquire it at the price asked he would have to act quickly.   He did not at the time have the requisite amount of cash on hand to finance the deal.   On numerous other occasions he had associated with him certain individuals who had advanced money for the financing of such deals and who had been permitted to participate in the profits arising therefrom.

When he learned of the opportunity above referred to he communicated with one Charles E. Pettinos and asked him if he would be interested in the proposition and if he could furnish sufficient money to finance it. Pettinos stated that he did not have the funds on hand, but would see if he could get a friend or two to come in with him. He and a friend, one Franklin Remington, and Bowler met the next morning and, after examining the property, decided to buy it. Bowler told them, " I will give you 100 per cent profit in the deal, and after 100 per cent—if we make more than 100 per cent—I will get the balance." They had no idea how much would be made out of it.

The property to be purchased consisted of real estate, buildings, Liberty bonds, cash in bank, and accounts receivable and stock on hand. The accounts receivable stood at $106,000 or $108,000. The other assets included $40,000 Liberty bonds and $23,000 in bank.

A down payment of $10,000 had to be made at once. Bowler advanced $10,000 to the Tocabo Investing Co., which made the down payment of $10,000 and took title to all the assets acquired, other than the real estate. The real estate was taken in the name of the Bullfrog Building Co. Both of the last named companies were similar in character to the petitioner. Under the agreement, or agreements, with the trustees the balance of the purchase price ($115,000) did not have to be paid prior to June 10, 1926, provided the purchasers would secure the vendors by the deposit of sufficient collateral with the Equitable Trust Co. Pettinos, Remington, and Bowler deposited as collateral with the Equitable Trust Co. securities having a fair market value at the time of approximately $180,000. Pettinos and Remington each deposited collateral of a fair market value of approximately $80,000 and Bowler collateral of a value of from $20,000 to $24,000.

On or about April 9, 1926, the petitioner purchased from the Tocabo Investing Co. the assets which it had acquired from the trustees in liquidation of the Manhattan Brass Co. for a consideration of $110,000. Immediately thereafter it began the liquidation of the assets thus acquired. It withdrew from the bank a part of the $23,000 on deposit, sold the Liberty bonds, and collected the accounts receivable as fast as possible. Within two or three weeks it had succeeded in selling the machinery acquired for $57,000 cash. All the amounts thus received were paid over to the Equitable Trust Co. Prior to May 19, 1926, the Equitable Trust Co. had paid the balance of the purchase price to the trustees in liquidation. Thereupon the Equitable Trust Co. returned to Pettinos, Remington, and Bowler all the securities which they had deposited with it as collateral.

On May 19, 1926, a resolution was passed by the petitioner's directors, reading as follows:

Inasmuch as the company has collected from accounts receivable and from the sale of various assets acquired from the Manhattan Brass Company contract, such as Liberty Bonds, machinery, and so forth, in excess of $160,000, and has paid to the trustees in liquidation of the Manhattan Brass Company, $150,000, thus making it unnecessary to call on the underwriters of the series A notes issue, authorized at the meeting of the Board of Directors held April 9, 1926, for any sum whatsoever, resolved

That the company issue no series A notes and reimburse the Tocabo Investing Company, Inc., in cash for $10,000 initially paid by said Tocabo Investing Company, Inc., to the trustees in liquidation of the Manhattan Brass Company, and

Further resolved that the company issue the series B notes authorized in the resolution of April 9th, being several series B notes, May 1, 1926.

The above resolution was passed after agreement between Pettinos, Remington, and Bowler that the action would be satisfactory to them. Pursuant to the resolution series B notes dated May 1, 1926, were issued and delivered. There were eight series B notes issued, one for $50,000 due January 30, 1929, to Charles E. Pettinos, one for the same amount due on the same date to Franklin Remington, and the remaining six aggregating $50,000 due on the same date to Robert B. Bowler.

After the trustees in liquidation had been paid the purchase price for the assets, the remainder of the money collected by the petitioner was used in part payment of the series B notes. Pettinos, Remington, and Bowler received payments upon such notes in 1926 as follows:

| 1926 | Pettinos | Remington | Bowler |
|---|---|---|---|
| June — | $5,000 | $5,000 | $5,000 |
| June 16 | 10,000 | 10,000 | 10,000 |
| June 25 | 10,000 | 10,000 | 10,000 |
| Sept. 14 | 5,000 | 5,000 | 5,000 |
| Dec. 1 | 4,000 | 4,000 | 4,000 |
| Total | 34,000 | 34,000 | 34,000 |

In its income tax return for 1926 the petitioner deducted from gross income $102,000 representing the amounts paid on the series B notes. This amount was disallowed by the respondent in the determination of the deficiency.

We do not think that the contention of the petitioner that the $102,000 in question may be deducted from gross income as interest on indebtedness can be sustained. The series B notes were not given to liquidate an interest charge. The agreement which the petitioner made with Pettinos, Remington, and Bowler was that they should receive the profits of the business up to $150,000; in fact, any profits distributable beyond that amount were to go to Bowler in part

payment for services performed. The payments on the notes represented distributions of profits.

The principal contention of the petitioner is that the $102,000 is deductible from gross income under section 234 (a) (1) of the Revenue Act of 1926, which permits the deduction from gross income of " all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered." In connection therewith it calls attention to article 101 of Regulations 69, which, so far as material, provides as follows:

BUSINESS EXPENSES.—*Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business,* * * * Among the items included in business expenses are management expenses, *commisisons,* * * * A taxpayer is entitled to deduct the *necessary expenses paid in carrying on his business from his gross income.* * * * [Italics ours.]

We are of opinion that this claim of the petitioner rests upon no firmer ground than the first contention adverted to. What constitutes ordinary and necessary expenses deductible from gross income may be affected by time, place, and circumstance. Cf. *Welch* v. *Helvering,* 290 U. S. 111. We have been unable to find any case in which the Board or the courts have held that a distribution to stockholders or to others of the entire profits of a corporation constitute ordinary and necessary expenses deductible from gross income. In the proceeding at bar all of the profits were thus to be distributed. The share of the profits payable to Bowler was in part compensation for services. The record does not show what, if any, salary Bowler was to receive from the corporation or did receive from it in 1926. We can not determine therefore whether the amount paid to him in the redemption of his series B notes, in addition to his regular salary, if any, constituted reasonable compensation for personal services actually rendered.

The claim of the petitioner, however, rests upon the broader ground that the entire amount paid to Pettinos, Remington, and Bowler in 1926 represents ordinary and necessary expenses because the business was hazardous and the amounts paid were not in excess of the amounts that would have been paid for a loan of money by a money lender. We have carefully considered this argument, but are not persuaded by it. The contract made by the petitioner with the three individuals named was that if they would put up the money to finance the deal all the profits would be paid to them. From their standpoint the transaction was a joint venture. The distribution of the profits in the amount of $102,000 in 1926 did not constitute the payment of ordinary and necessary expenses of the petitioner.

In *Traylor Engineering & Mfg. Co.* v. *Lederer*, 271 Fed. 399; certiorari denied, 257 U. S. 638, the Circuit Court of Appeals for the Third Circuit had before it a case somewhat similar to the present one. In that case it appeared that two individuals had "grubstaked" a corporation in obtaining certain contracts for the manufacture of munitions. In consideration of such "grubstaking" the corporation agreed that certain profits arising from the contracts should be paid to the individuals who had advanced money in securing the contracts. The court held that the profits thus paid were not a legal deduction from gross income in determining the profits of the business subject to the munitions manufacturers' tax. In our opinion the principle applied by that court is equally applicable to the proceeding at bar.

In support of its contention petitioner cites *Wiggin Terminals* v. *United States* (C. C. A., 1st Cir.), 36 Fed. (2d) 893. In that case plaintiff agreed to pay a 100 percent bonus for the loan of $50,000, which loan was to bear interest at 6 percent per annum. The court held that the amount paid to the lender was a legal deduction from gross income. It does not appear, however, from the opinion of the court in that case that the amount was in any sense a distribution of profits of the corporation. Petitioner also cites *Jones Syndicate* v. *Commissioner* (C. C. A., 7th Cir.), 23 Fed. (2d) 833. The question there was whether so-called dividends on preferred stock could be deducted by the syndicate as interest upon a loan. The court held in the circumstances of the case that the amount was deductible as interest. We think that that proceeding is distinguishable from the present one on its facts.

Reviewed by the Board.

*Judgment will be entered for the respondent.*