BUFFALO EAGLE MINES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 70190.   Promulgated May 13, 1938.

*E. L. Hogsett, Esq.*, for the petitioner.
*P. M. Clark, Esq.*, and *S. B. Pierson, Esq.*, for the respondent.

844

OPINION.

ARNOLD: Part of the $46,616.82 payment made by petitioner was made pursuant to the terms of the Altizer lease, and part thereof was pursuant to the agreement between petitioner and its assignor, Lemkuhl. Each of these instruments obligated the petitioner to pay 10 cents a ton upon coal produced. The lease expressly characterizes the payments of 10 cents a ton therein provided for as royalties or rents, and there is no dispute between the parties as to the tax significance of the payments to the original lessors. The petitioner has deducted them as "Rent on Business Property—Royalty", and the respondent has allowed the deduction.

The Lemkuhl agreement makes no attempt to characterize the payments therein provided for. The agreement, after reciting that Lemkuhl has "sold, transferred and conveyed" the properties to petitioner, contains an outright promise to pay 10 cents per gross ton on the production of the company. The petitioner has treated the payments made thereunder as being in the same category as the payments made under the Altizer lease. Compare *C. H. Mead Coal Co.*, 31 B. T. A. 190, where advance royalties were held to constitute income of the lessor.

The respondent contends that the payments made to Lemkuhl were expenditures for the acquisition of capital assets, or represented a distribution of the profits of the corporation. Whether the disputed payments are deductible depends upon the nature of the obligation created. An analysis of the agreement in the light of all the surrounding facts and circumstances should indicate the nature of the obligation, from which we can determine whether the aggregate

payment was an ordinary and necessary business expense, a capital expenditure, or a plan devised to distribute profits of the corporation in the guise of royalty payments.

At the hearing the parties stipulated that "the amount of $23,-308.41 of royalties", which is here in question, was included in the adjusted net income, as stipulated, of $29,259.74. We do not understand that the parties have stipulated that $23,308.41 is, as a matter of fact, a payment of "royalty." Furthermore, the opening statements of counsel and the statements in their briefs, which referred to the total amount paid under the Lemkuhl agreement as royalty, does not preclude us from a determination of the legal significance of the transaction between Lemkuhl and the petitioner.

When Lemkuhl purchased the Colliery assets at the tax sale he acquired all of the right, title, and interest that the Colliery Co. had in the lease and in the improvements and equipment used in mining the coal. If Lemkuhl had elected to operate the properties, individually, he would have had the same legal and economic interests with respect to the remaining coal in place as the original lessee. That is to say, Lemkuhl acquired by his purchase the unexpired term of the original lease, which gave the owner of the lease the exclusive possession of and the right to mine and remove the remaining coal in place upon payment of certain rentals or royalties. We think it beyond question that Lemkuhl's purchase gave him property rights which would have been subject to depletion if he had individually operated the property. *Palmer* v. *Bender*, 287 U. S. 551; *Thomas* v. *Perkins*, 301 U. S. 655; *Bankers Pocahontas Coal Co.* v. *Burnet*, 287 U. S. 308; *Holly Development Co.* v. *Commissioner* (C. C. A., 9th Cir.), 93 Fed. (2d) 146; *Commissioner* v. *Jamison Coal & Coke Co.* (C. C. A., 3d Cir.), 67 Fed. (2d) 342; *Strother* v. *Commissioner* (C. C. A., 4th Cir.), 55 Fed. (2d) 626; affd., *Strother* v. *Burnet*, 287 U. S. 314. Cf. *Helvering* v. *Elbe Oil Land Development Co.*, 302 U. S. 677, affirming 34 B. T. A. 333.

Lemkuhl, however, did not elect to operate the coal properties in any capacity. He caused the petitioner to be created, offered the properties acquired to it, and upon acceptance of his offer transferred the property rights so acquired to petitioner, subject to a continuing charge of 10 cents per gross ton on each ton of coal mined. Lemkuhl thereby retained an interest in each and every ton of coal in the ground, for which he was to receive 10 cents for each ton mined. If there was no production, there was no obligation to pay Lemkuhl. The obligation to pay and the amount due were equally contingent upon the exercise of the right to exploit and remove the coal. This was no less true of the payments to be made under the original lease, except for minimum royalties, and if the

one is admittedly royalties, and deductible from gross income, we think the other falls in the same category.

The respondent relies upon the reasoning in our decision in *Comar Oil Co.*, 24 B. T. A. 688; affd., *Comar Oil Co.* v. *Burnet*, 64 Fed. (2d) 965; certiorari denied, 290 U. S. 652. In that case certain oil and gas leases were transferred to the Comar Oil Co. in consideration of stated sums of money, which sums were payable partly in cash and partly out of oil and gas as produced from the leased property. The deferred payments out of oil produced were claimed to be rentals or royalties for the use of the property. The Board held that the deferred payments out of oil and gas were not royalties, but were capital transactions. In the course of our opinion we said (p. 691):

* * * The terms of the various assignments of leases effected absolute conveyances to the petitioner of the entire interests owned by the respective assignors, none of whom made any reservation of royalties. A royalty, as to minerals, is a rent reserved. Here, the grantor sold and the petitioner bought mineral rights for definite, fixed considerations which were to be met, in part, by deferred payments out of minerals if, as, and when produced from the leased lands. Such payments in our opinion do not constitute rentals or royalties for the use of the property.

We cited in support of our decision *Mrs. J. C. Pugh, Sr., Executrix*, 17 B. T. A. 429; affd., *Pugh* v. *Commissioner*, 49 Fed. (2d) 76; certiorari denied, 284 U. S. 642; *L. T. Waller*, 16 B. T. A. 574; affd., *Waller* v. *Commissioner*, 40 Fed. (2d) 892; *Lena Brown*, 24 B. T. A. 30; *S. L. Herold*, 17 B. T. A. 933; affd., *Herold* v. *Commissioner*, 42 Fed. (2d) 942.

The Eighth Circuit, in affirming the Board's conclusion, spoke of the deferred payments as "overriding royalties", concluded that the overriding royalties were correctly included in the gross income of the Comar Oil Co., and denied the deduction of the amount thereof because "it is clear that title to the property [the leases] was taken by the petitioner."

Subsequent to the denial of certiorari in the *Comar Oil Co.* case, *supra*, the Supreme Court granted certiorari in *Thomas* v. *Perkins*, 300 U. S. 653, because of an apparent conflict in the decision of the Fifth Circuit in *Perkins* v. *Thomas*, 86 Fed. (2d) 954, with the decision of the Eighth Circuit in *Comar Oil Co.* v. *Burnet*, *supra*. The decision of the Supreme Court in *Thomas* v. *Perkins*, 301 U. S. 655, reveals an assignment of oil and gas leases in consideration of cash paid, $10, and the further sum of $395,000, to be paid out of the oil produced and saved from the lands, and to be one-fourth of all the oil produced and saved until the full sum was paid. The assignment recites that in consideration of the foregoing sum we "do hereby bargain, sell, transfer, assign, and convey all our rights, title, and interest in and to said leases and rights thereunder." The fixed sum

was payable only out of oil produced and was not a personal obligation of the assignee. The purchaser of the oil was to make payments directly to the assignors until the $395,000 was fully paid. The question which the Supreme Court was asked to determine was whether the assignee's gross income should include moneys paid to the assignors by purchasers of the oil produced. The Supreme Court held that payments to the assignors should not be included in the assignee's income because the proceeds received by the assignors "necessarily covered and were derived from oil not transferred by the assignment." As the case of *Comar Oil Co.*, *supra*, and cases cited in support of the principle there announced is inconsistent with the pronouncements of the Supreme Court in *Thomas* v. *Perkins*, *supra*, they can no longer be considered as controlling.

In *Palmer* v. *Bender*, *supra*, which was reviewed at length in the *Perkins* case, the Supreme Court, in commenting with approval on *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364, stated:

\* \* \* regardless of the technical ownership of the ore before severance, the taxpayer, by his lease, had acquired legal control of a valuable economic interest in the ore capable of realization as gross income by the exercise of his mining rights under the lease. \* \* \*

The Court further said:

Similarly, the lessor's right to a depletion allowance does not depend upon his retention of ownership or any other particular form of legal interest in the mineral content of the land. It is enough if, by virtue of the leasing transaction, he has retained a right to share in the oil produced. If so he has an economic interest in the oil, in place, which is depleted by production. Thus we have recently held that the lessor is entitled to a depletion allowance on bonus and royalties, although by the local law ownership of the minerals, in place, passed from the lessor upon execution of the lease. \* \* \*

In the present case the two partnerships acquired by the leases to them, complete legal control of the oil in place. Even though legal ownership of it, in a technical sense, remained in their lessor, they, as lessees, nevertheless acquired an economic interest in it which represented their capital investment and was subject to depletion under the statute. \* \* \* When the two lessees transferred their operating rights to the two oil companies, whether they became technical sublessors or not, they retained, by their stipulations for royalties an economic interest in the oil in place identical with that of a lessor. *Burnet* v. *Harmel*, supra, [287 U. S. 103, 11 A. F. T. R. 1085]; *Bankers Pocahontas Coal Co.* v. *Burnet*, supra, [287 U. S. 308]. Thus throughout their changing relationships with respect to the properties, the oil in the ground was a reservoir of capital investment of the several parties, all of whom, the original lessors, the two partnerships, and their transferees, were entitled to share in the oil produced. Production and sale of the oil would result in its depletion and also in a return of capital investment to the parties according to their respective interests. \* \* \*

In *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312, the syndicate, as the assignee of the lessee named in an oil and gas lease, extracted substantial quantities of oil. By the terms of the lease and

the assignment the syndicate was obligated to pay royalties in cash or in kind totaling one-fourth of the oil extracted. The taxpayer wanted to compute its depletion allowance upon the gross proceeds of all the oil produced. The Commissioner computed the deduction upon the taxpayer's portion of the oil produced. The Supreme Court upheld the Commissioner's computation, denying the syndicate's contention that its gross income was the gross production of the wells. The Court specifically stated that the taxpayer's gross income from the property was gross income from production less the amounts which the taxpayer was obliged to pay as royalties.

This proceeding differs from the last cited Supreme Court cases in that here we have the assignee claiming the right to deduct royalties paid pursuant to contract, but not in any fixed aggregate sum. The royalties are due so long as coal is produced from the lands leased. If the question at issue was the inclusion of the royalties paid in the petitioner's gross income, *Thomas* v. *Perkins, supra,* would be directly in point. The petitioner having included in its gross income the gross receipts from production, now seeks to deduct the payments as royalty in order to correctly reflect its income. The Fourth Circuit in *Burnet* v. *Hutchinson Coal Co.*, 64 Fed. (2d) 275; certiorari denied, 290 U. S. 652, permitted such a deduction, and certainly if the question here for decision was the depletion to which petitioner was entitled, *Palmer* v. *Bender, supra,* would prevent the computation of a depletion allowance based in part on the gross income of the lessor and petitioner's assignor.

Whether the deduction be characterized as a part of the cost of production, an ordinary and necessary business expense, or as royalties or rentals for the use of the property, we are of the opinion that the $23,308.41 should be deducted from petitioner's gross income. The obligation to pay is based upon a contractual liability which is a charge upon the operation of petitioner's business and the production of coal. If the amount be not deductible as rental or royalty, it is certainly deductible as an ordinary and necessary business expense for petitioner's continued operation was dependent upon the payments being made quarterly while the mine was being operated, and without the expenditure petitioner could not operate. *Monroe Sand & Gravel Co.*, 36 B. T. A. 747, 751; *Louis C. Rollo*, 20 B. T. A. 799, 806; sec. 23 (a), Revenue Act of 1928.

In reaching our decision herein we have treated Lemkuhl as though he were the real party in interest. We have not, however, lost sight of the fact that Lemkuhl at all times pertinent to the issue presented was acting for the former stockholders of the Colliery Co., and that by subsequent conveyances the former stockholders became petitioner's stockholders and owners of the contractual rights in the

aforementioned Lemkuhl agreement. We do not believe that this fact is controlling, since the *bona fides* of the transaction is not questioned. Its chief importance lies in the possibilities afforded under like circumstances to distribute profits as royalties.

Respondent's principal argument is directed to the possibilities afforded by this transaction. He asserts that the relationship of the parties and their formal acts indicate an intention to distribute profits in the form of extraordinary royalties. He relies upon the Board's decision in *George La Monte & Son*, 13 B. T. A. 365, and a decision of the Third Circuit in *Traylor Engineering & Manufacturing Co.* v. *Lederer*, 271 Fed. 399. The *La Monte* decision was reversed in *La Monte & Son* v. *Commissioner* (C. C. A., 2d Cir.), 32 Fed. (2d) 220, and the *Traylor Engineering* case is distinguishable in that the contract there was to pay a portion of the profits after they were created, which is entirely different from an obligation to pay a fixed charge on production regardless of earnings or profits necessary for the payment of dividends. Our decisions in *W. N. Thornburgh Manufacturing Co.*, 17 B. T. A. 29, and *L. Schepp Co.*, 25 B. T. A. 419, involved situations where taxpayers were attempting to distribute profits under the guise of royalty payments. The facts in those cases are so divergent from the facts herein that we deem it unnecessary to make a detailed comparison.

The deficiency should be recomputed in accordance with the stipulation of the parties and with our decision herein.

Reviewed by the Board.

*Decision will be entered under Rule 50.*