Abilene Life Insurance Company v. Commissioner.
Abilene Life Ins. Co. v. Commissioner
Docket No. 109171.
United States Tax Court
1943 Tax Ct. Memo LEXIS 457; 1 T.C.M. (CCH) 716; T.C.M. (RIA) 43069; February 10, 1943
*457 Robert Ash, Esq., Munsey Bldg., Washington, D.C., for the petitioner. Donald P. Moyers, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding places in issue determinations made by respondent of deficiencies and penalties in the amounts and for the years indicated as follows: Year
Deficiency
Penalty
1930
$ 396.58
$ 99.15
1934
766.35
191.59
1935
51.51
12.88
1936
449.67
112.52
1937
1,176.14
294.04
1940
189.87
37.97
One question involved is whether petition is exempt from taxation as a "benevolent life insurance association of a purely local character" under section 101 (10) Internal Revenue Code, and comparable provisions of prior applicable revenue laws. In the alternative it is contended that petitioner is a life insurance company as defined in sections 201-203 of the Internal Revenue Code and comparable provisions of prior applicable revenue acts. It is also contended that funds which petitioner was required by state authority to place in a mortuary fund were not income to it because of their alleged character as trust funds. Respondent, by amended answer, challenges the reasonableness of salaries of petitioner's *458 officers for the years 1934, 1935, 1936, 1937, and 1940, and seeks increased deficiencies and penalties. Findings of Fact Petitioner is an association organized under the laws of Texas with its principal place of business at Abilene, Texas. The returns for the periods in question were filed with the collector of internal revenue for the second district of Texas. Petitioner was originally organized in 1919 under the name of Abilene Mutual Life Insurance Association. It had "Articles of Association" which were filed with the Board of Insurance Commissioners of the State of Texas, and which stated that "the Association shall be chartered for a term of 50 years." In addition it had by-laws referred to as the "Constitution and By-Laws," which were "adopted to provide rules and regulations for its government." These referred to petitioner as a "local mutual aid association" operating within a territory bounded by counties embraced within a radius of 50 miles of Abilene. The certificate of the Board of Insurance Commissioners shows that these by-laws were filed in the Department of Insurance of the State of Texas on November 7, 1929. The pertinent provisions of this "Constitution and *459 By-Laws," under which petitioner operated until February 6, 1933, are in substance as follows: Management and supervision of petitioner was vested in a board of directors of five or more members elected at any regularly called meeting. Claims for death or injury were met by assessment against the members of a particular class. There were several classes. Members were automatically suspended on the failure to pay assessments or dues. A fund to be known as the mortuary fund was to be created and maintained by the payment of $1.00 into the fund from each assessment of $1.10. The 10 cents was to be placed in a fund known as the general fund. Assessments of 25 cents and 50 cents covering accidents were to be placed in the mortuary fund. For each assessment of 60 cents in the children's class 50 cents was to be placed in the mortuary fund and 10 cents in the general fund. It was provided that the mortuary fund was to be used for the payment of benefits "and any other expense necessary to protect funds deposited in the name of the Association." After all approved claims had been paid surplus funds in the mortuary account were to become a reserve to be used to pay excess death claims. *460 In order to provide a reserve fund the association could levy not exceeding two reserve assessments in the amount of $1.10 each calendar year to be divided equally between the general fund and the payment of claims without assessment. It was provided that the general fund, i.e. money not credited to the mortuary fund, should be the sole property of T.S. Rollins as compensation for his services, subject to the payment by him of all expenses incident to the management of the association. By amendment to the by-laws on January 30, 1933, filed with the Department of Insurance of the State of Texas on February 6, 1933, it was provided, inter alia, that the association could levy an unlimited number of additional assessments for the purpose of strengthening the mortuary fund or provide a reserve fund, such assessments to be divided equally between the mortuary and the general funds. By amendments to the by-laws on March 10, 1934, filed March 13, 1934, it was provided that petitioner's officers were authorized to change its plan of operation from one of an assessment-as-needed plan to one calling for a stipulated premium or assessment of a fixed amount monthly. The new by-laws provided *461 that assessments beyond this fixed payment could be levied for either the mortuary or expense fund. It was further provided that the first three monthly premiums paid by a new member were to be placed in the expense fund, payments thereafter to be divided 60 per cent to the mortuary fund and 40 per cent to the expense fund; that petitioner could pay out of the mortuary fund the attorneys' fees and necessary expenses arising out of the settlement of contested claims. Other amendments to the by-laws dated April 10, 1934, filed April 11, 1934, and dated June 6, 1935, and filed June 14, 1935, abandoned petitioner's division of its members into classes, merged all the classes and placed them on the stipulated assessment plan. The petitioner then issued policies which were described as New Plan Life, Family Group and Convertible Family Group, which type policies continued in use until January 20, 1940. By an amendment dated August 1, 1935, filed August 12, 1935, petitioner's area of operation was increased from counties within a radius of 50 miles from Abilene to counties within a radius of 75 miles. When petitioner changed its name on March 31, 1936, it also adopted certain policy forms *462 which contained, inter alia, the following provisions: 12. The premium rate herein fixed has been scientifically computed and is deemed adequate, but in compliance with the State Laws and to give additional protection, the Company reserves the right to levy and the Insured agrees to pay additional premiums, if needed; however, this provision for extra premiums is a requirement of the State Laws and not because the rate shown herein is deemed inadequate. Similarly, the policies stated: While the premiums or assessments shown herein, on the Insured at the age given, are considered adequate to meet all requirements, yet, if needed, the Association reserves the right to levy additional assessments in excess of the regular premiums or assessments as shown herein, upon the policyholders of this Division or Class, to provide a Surplus Fund, or to pay claims or expenses. An amendment to the by-laws, dated November 7, 1939, to meet the requirements of Senate Bill No. 135 was filed January 20, 1940. The revised by-laws called for annual meetings of members, for maximum insurance of $2,500, and provided that the "Mortuary Fund of each class, group or club, shall be devoted alone to *463 the payment of death claims of beneficiaries of deceased members of such class, group or club, * * *, and attorney's fees and the necessary expenses arising out of the defense, settlement or payment of questionable or contested claims against such class, group or club." The policy forms incorporated in the "Constitution and By-Laws" carried similar provisions to those above quoted relating to the collection of additional premiums. As of November 25, 1939, petitioner still had policies of a certain class covering accidental death and certain injuries in effect on the assessment-as-needed plan. This class of policies was taken over by another company by the end of 1939 and the mortuary fund in that class was transferred to the company which took over the membership. Since January, 1940, petitioner has issued only two general types of policies known as the New Plan Life Policy and the Convertible Family Group Policy. Petitioner's policies were issued on various written applications which were general in nature and directed primarily to a statement of the applicant's health. All the applications carried a proxy in favor of T. S. Rollins to vote in the stead of the applicant if membership *464 in the association was granted. During all the times here material petitioner had general agency contracts with T. S. Rollins dated May 5, 1930, December 18, 1937, and February 1, 1940. Under these contracts T. S. Rollins, who was petitioner's secretary-treasurer and from 1937 its president, was given the exclusive agency to procure members for petitioner throughout its geographic limits. Under the May 5, 1930, contract T. S. Rollins was to receive all of the expense fund and was to pay all expenses up to $1.00 annually for each member in good standing, and such other expenses as to which he would specifically assent. The December 18, 1937, contract recited that T. S. Rollins had managed and operated petitioner since its organization and devoted his time and personal funds in building it up "and is in fact [its] * * * legal and/or equitable owner." It was agreed that T. S. Rollins should have a 10-year contract for the full control and management of petitioner for which he was to receive "as his remuneration and salary all the money which The Company is allowed and permitted to place in the General or Expense Funds according to law and under the rulings of the Department of Insurance *465 of Texas." T. S. Rollins agreed to pay all expenses of operation except claims and expenses chargeable against mortuary funds. It was stated that T. S. Rollins "is the owner of all money allotted to the Expense and General Funds." The agreement of February 1, 1940, made similar recitals and employed T. S. Rollins as manager and sole agency director of petitioner for a period of 25 years and made similar statements as to his compensation and salary. It further provided that the contract was binding upon the parties, "their heirs, successors and assigns" and "that in the event of the death of the said T. S. Rollins that his heirs, successors and assigns shall continue the operation of The Company under the terms of this contract in keeping with the desires and wishes of the said T. S. Rollins." During the period when petitioner was operating on the assessment-as-needed plan and while the mortuary funds of each class were separately kept, no class could obtain funds from any other class with which to pay its claims. Assessments were made on the members of various classes when a claim arose in their class and the amount paid to the claimant depended on the amount realized from the assessment *466 without regard to the amount being carried in the mortuary fund of that particular class. The older companies of petitioner's class could satisfy their policy obligations through assessments which paid only 25 per cent of the face of the policy. Petitioner was forbidden by Texas statute to issue level premium policies of a guaranteed face amount. Petitioner derived its income from the fees, dues, assessments and premiums paid on its policies. Such income was allocated under the by-laws between the mortuary fund and the general or expense fund. None of petitioner's mortuary funds were invested. Prior to January 1, 1940, the date when a law known as Senate Bill No. 135 became operative, there was no statutory requirement of Texas law requiring companies of petitioner's type to make the 60-40 division of their gross assessment of premium income between a mortuary fund and general fund. Petitioner's division up to March, 1934, had been an equal division between the two funds. During the period from February 8, 1934, to January 1, 1940, the Department of Insurance of the State of Texas had in effect a regulation, promulgated under its authority to supervise and approve the by-laws of *467 such companies, under which it required a 60-40 division between the two funds. Petitioner complied with the regulation shortly after its issuance. The premiums charged by petitioner were not supervised by the officers of the State Insurance Commission unless the premiums were manifestly inadequate. The premiums charged were not based on any mortality computations and were not designed to produce an amount of money which with accretions from interest would mature or liquidate the respective policies. The mortuary fund was never treated as an investment fund for the purpose of creating an interest income which would form the accretions to the premiums or assessments and mature the policies. It was a fund created for the single purpose of paying claims as they arose. It is usually kept in a liquid state for the immediate payment of claims. The mortuary fund is carried in the name and under the control of petitioner. In theory the mortuary fund was to be used only for the payment of claims by petitioner, but petitioner paid amounts out of the mortuary fund for reimbursements to the general fund at various times. The mortuary fund is regarded by the State Insurance Department as belonging *468 to the various beneficiaries after claims have arisen and as a fund belonging to the company to be used only for a designated purpose. Policyholders have no right to any portion of the mortuary fund unless they have a claim or unless the company is being liquidated. Their policies have no cash surrender value. The mortuary fund is carried as an asset on the form required by the state, of companies such as petitioner's for annual filing. There is a difference of opinion in the Insurance Department as to whether it is an asset or liability. At one time it appeared on the official form as a liability, but this was discontinued. Petitioner filed annual statements with the Insurance Department of the State and was examined by officials of that department at least once every two years. Certificates or permits to do business were issued annually as the result of the annual statements filed or examination held or both. The Insurance Department of the State had no interest in the general or expense fund of petitioner other than the Department's interest in seeing that the legitimate bills against petitioner were paid, and, as the company was operated, neither had the policyholders as members *469 of the association. The Department has no control over the amounts received by the operators or officials of petitioner out of the general or expense fund but is advised through the annual statements of the amounts paid them. In its annual report for the year 1930 petitioner stated that T. S. Rollins, its secretary-treasurer, took "all the expense, assessments and other money collected" and paid "all expenses and claims of the Association" and retained the balance "as his salary." The income and disbursements of petitioner for the years here involved and the allocation of the mortuary fund between the various classes for much of those years as the various classes existed were correctly set forth in the respective annual reports filed by petitioner and appear from the certified copies of such reports introduced in evidence as petitioner's exhibits 12 and 13. The State Insurance Department of Texas did not regard petitioner's type of company as being comparable to the "old line legal reserve" companies and the forms for the annual reports of the two types of companies are not the same; the "reserve" and "relief" fund requirements are different. In the notice of deficiency respondent *470 computed petitioner's deficiency as provided in section 204 of the Internal Revenue Code and the comparable sections of the applicable revenue acts. T. S. Rollins has been the active officer of petitioner during all of the time here pertinent. Under the contracts above set out he has had complete control over the company and the allocation and disbursement of the general fund. Although he is 80 years old and hard of hearing he takes an active part in the management and control of petitioner's business. As above indicated, after serving as secretarytreasurer of petitioner he became its president in 1937. He has charge of hiring and discharging employees and agents; he oversees the advertising, passes on applications and claims and has charge of the daily cash book. He is not paid a fixed salary, but takes what he wants out of the general fund after expenses have been paid. He is in the office six days a week from opening until closing. He is available to members who come in to pay their assessments and he enters the payments in the books. He was formerly postmaster at Abilene and a county commissioner. In Abilene petitioner is commonly known as "Mr. Rollins' Company." Petitioner *471 only has two active officers, T. S. Rollins and his son J. T. Rollins. The following schedule shows for the years indicated petitioner's gross collections and the "salary" drawn down or paid to T. S. and J. T. Rollins: Officers'
Salaries
Gross
T. S.
J. T.
Year
Collections
Rollins
Rollins
1934
$86,063.49
$ 5,890.00
$3,980.19
1935
77,412.50
12,786.65
3,997.38
1936
66,921.20
11,800.00
3,145.35
1937
67,006.25
10,481.72
3,303.00
1938
67,888.80
11,270.75
3,456.18
1939
68,360.65
7,764.52
2,772.00
1940
67,623.11
6,594.73
3,402.00
The salaries paid petitioner's officers for the years in question were not unreasonable. Opinion That petitioner's classification as an insurance company other than life, requiring the computation of its tax in accordance with respondent's determination, under Internal Revenue Code, section 204 and 207, and the predecessor provisions, was correct, and that the payments into its mortuary fund do not constitute an exclusion from its gross income follow in this proceeding on the authority of General Life Insurance Company, 1 T.C. 555, decided herewith and for the reasons there set forth. *472 The parties are in agreement that the issues and contentions in the two proceedings are to that extent identical. The further assertion is advanced on petitioner's behalf here that it is in any event exempt from tax under Internal Revenue Code, section 101 (10) as a benevolent life insurance association of a purely local character, 85 per centum or more of the income of which consists of amounts collected from members for the sole purpose of meeting losses and expenses. As in the case of General Life Insurance Company, supra, we cannot say that the 40 per cent of petitioner's gross income which by its agency agreement was to be paid to the individuals conducting its operations are definitely "used or held for the purposes of paying losses or expenses." This portion of the proceeds of petitioner's business which is, of course, by hypothesis more than the 15 percent permitted by the statutory definition, would be payable under its contracts regardless of any losses or expenses or of any consideration which might be given to their size or extent. We give but passing notice to any such contention as that the payments under the agency contract were in *473 themselves expenses since a division of profits cannot masquerade under the guise. L. Hyman & Co., 21 B.T.A. 159, 167; Moxa Building Company, 31 B.T.A. 457, affirmed (C.C.A. 2nd Cir.), 79 Fed. (2d) 1004; Samuel Heath Co. v. United States, 2 Fed. Supp. 637 (Ct. Cl.); C. S. Ferry & Son, Inc., 18 B.T.A. 1261; National Contracting Company, 37 B.T.A. 689, affirmed (C.C.A., 8th Cir.) 105 Fed. (2d) 488. In the absence of a showing that payments under the agency contract would at all times be limited to amounts reasonably necessary to defray the expenses of petitioner's operation and would consistently exclude any division of profits beyond such necessary amounts, we are not prepared to view petitioner as a benevolent life insurance association within the meaning of the section relied upon. It does not follow, however, that respondent's claim asserted affirmatively that the payments to petitioner's officers were not reasonable should be sustained. Since respondent accepted the burden *474 on this issue, it was incumbent upon him to show at least the fair value of the services performed by petitioner's officers or such comparisons with other enterprises similarly situated as to satisfy us that the compensation allowed here was disproportionately large. In the absence of any satisfactory evidence of that nature we must disapprove the effort to increase the deficiency. No evidence to contest the imposition of penalties was introduced, and no contention in this respect is made in petitioner's brief. We must accordingly regard the issue as abandoned. Carding Gill, Ltd., 38 B.T.A. 669. Decision will be entered under Rule 50.