OPINION. OppeR, Judge: Under the rule which we have consistently followed, petitioner is not a life insurance company within the definition of section 201 of the Internal Revenue Code[1] unless at least 50 percent of “its total reserve funds” are true life insurance reserves required to be maintained by the law under which it operates. Standard Industrial Life Insurance Co. of Louisiana, Inc.., 42 B. T. A. 1011; Independent Life & Accident Insurance Co., 47 B. T. A. 894; see also Swift & Co. Employes Benefit Association, 47 B. T. A. 1011. Petitioner, which does business on the mutual assessment plan in Texas, was required by the state board of insurance commissioners to carry in its so-called “mortuary fund” 60 percent of its entire gross income after either the payment of a membership fee, or the first three monthly premiums or assessments, paid by each member. This fund was petitioner’s only reserve for the payment of life insurance claims, and if it does not qualify under the definition, then petitioner failed to have 50 percent, or indeed any amount, of its total reserves held as reserves for life insurance contracts. There is no indication whatever that the mortuary fund was computed by use of mortality tables or an assumed interest rate or on any actuarial principle. “It is clear that, as used in sections 201 (a) and 203 (a) (2), the word ‘reserve’ has a technical meaning peculiar to the law of insurance and is not anything which a state statute or officer may so designate. * * * A reserve for a life insurance policy is built up sowiat in future years as the probabilities of death of the insured increase the premium may remain level. The amount of the reserves is actuarially computed according to recognized tables of mortality and with an assumed rate of interest.” Independent Life & Accident Insurance Co., supra. As in that case “The reserve here was not computed upon the basis of any mortality table. It was fixed at,a flat rate of * * * [60] percent of gross * * * [income]. Although this fulfilled the requirement of the * * * [Texas law], we do not think it is within the technical meaning of ‘reserve’ as used in the revenue acts.” Nor does there appear to be any provision of the Texas regulation which requires that the reserve for this type of insurance be actuarially computed. As a consequence even if petitioner had calculated its mortuary fund contributions on the basis of accepted life insurance principles the excess, not being required by law, would constitute a voluntary reserve fund and be ineffectual to qualify petitioner under the definition. Independent Life & Accident Insurance Co., supra. Neither Lamana-Panno-Fallo Industrial Insurance Co. v. Commissioner (C. C. A., 5th Cir.), 127 Fed. (2d) 56, nor National Protective Insurance Co., 44 B. T. A. 978; affd. (C. C. A., 8th Cir.), 128 Fed. (2d) 948, is out of harmony with these conclusions. In the former, a state statute requiring the actuarial computation of reserves was waived in part by the state authorities. Basing its opinion upon the “character” rather than upon the “sufficiency” of the reserves, the court held that they adequately complied with the tax definition. In the latter, the determinative question was the meaning of the term “total reserve funds” of an insurance company rather than the “reserve funds * * * held for the fulfillment of” life insurance contracts, which is the question here. In that case the contention was rejected that total reserve funds required by law include only true reserves, and that accordingly reserves for non-life insurance risks not so classified.were not to be included in the whole upon which the SO percent is computed. But there was no holding in either case that reserves held for the fulfillment of life insurance contracts, as that term is used in the statutory definition of life insurance companies, is to be differently defined from the cases first cited. On the authority thereof it is necessary to conclude that petitioner was not a life insurance company for purposes of the revenue acts. The provision of section 202 (b) referring specifically to assessment insurance[2] does not require a different conclusion. Even if it were not true, as the Board thought in Interstate Reserve Life Insurance Co., 37 B. T. A. 54, 60, that this provision “was meant merely’ to provide equality of treatment of assessment insurance by including within the meaning of ‘reserve funds required by law funds raised by assessment as well as from premium payments,” a statement fortified by the selection for that provision of a section defining gross income, there are two compelling reasons for rejecting its application here. The mortuary fund is not shown to have been “maintained under the charter or articles of incorporation” of the petitioner, nor to have been available “exclusively for the payment of claims arising under certificates of membership * * * and not subject to any other use.” Petitioner’s bylaws, not its charter, apparently created the fund, which could be used for expenses connected with the contest and settlement of claims as well as with their payment. Since there is and could be no claim that the sums in question were “actually deposited * * * with State or Territorial officers,” there is no aspect of that provision which can be said to govern this petitioner’s situation. Nor is it permissible to exclude from petitioner’s gross income the net additions to the mortuary fund on the theory that they were trust funds held for specific purposes. Its premiums are received by petitioner in the first instance in ordinary and unrestricted course and are not appropriated for the use or benefit of particular individuals. Cf. Board v. Commissioner (C. C. A., 6th Cir.), 51 Fed. (2d) 73. They are merely dedicated in part, after their receipt, to the payment, contest, or settlement of claims arising under the policies for which the respective premiums and assessments are paid. In essence they do not differ from the investment funds and reserves of other insurance companies which are maintained in order to liquidate claims. The receipts which constitute the basis of the payment into the mortuary fund are in effect petitioner’s gross income and they are so designated in the ruling of the Texas Insurance Commissioners. Nor can it be doubted that the premiums or assessments which petitioner received constitute the “underwriting income” expressly included in gross income under section 204 of the Internal Revenue Code and by inference under section 207. See Regulations 103, sec. 19.207-2; cf. Regulations 86, art. 207-1. The parties agree that these are the only alternative provisions for the taxation of petitioner if it is not a life insurance company. Even though it is required that, upon receipt, 60 percent of petitioner’s “gross income * * * shall be placed in the Mortuary Fund,” we can not say that that subsequent disposition deprives it of the character of income when received or exempts it from taxation under the applicable section of the law. West Side Tennis Club, 39 B. T. A. 149, 159; affd. (C. C. A., 2d. Cir.), 111 Fed. (2d) 6; certiorari denied, 311 U. S. 674; Clay Sewer Pipe Association, Inc., 1 T. C. 529. If it can be said that the payments into the mortuary fund would have any effect, it would rather be as a deduction or offset against income received. Cf. Monarch Life Insurance Co., 38 B. T. A. 801. For this, however, we look in vain to the section under consideration. We are accordingly of the opinion that the claim of petitioner that 60 percent of its gross income did not constitute any part of its gross income can not be sustained. The only question that remains is whether petitioner’s tax should be computed under section 204, which refers to “insurance companies other than life or mutual,” or under section 207, dealing with “mutual insurance companies other than life.” The more reasonable view of petitioner’s organization contradicts its contention that it was a mutual company. By means of its agency agreement the 40 percent of petitioner’s gross income not required for application to the mortuary fund was paid to the individuals responsible for the operation of petitioner and even prior to that agreement it does not appear that the members had any rights in the expense fund. No mattei how greatly its receipts from fees and assessments should exceed amounts required to pay expenses and losses, the policyholders were, as a practical matter, precluded from any participation in this portion of the proceeds of petitioner’s business. “It is of the essence of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policyholder.” Penn Mutual Life Insurance Co. v. Lederer, 252 U. S. 523. Since the 40 percent was computed without regard to actual cost, petitioner’s form of organization and operation apparently eliminated this essential requirement of mutual insurance. But, however that may be, no adequate answer appears to the respondent’s contention that under either section petitioner’s tax would be the same in view of the definition of “reserve funds,” as used in section 207. E.g. Regulations 94, art 207-4. In our view, accordingly, petitioner’s tax liability was correctly computed, and it is of no consequénce whether this is done under section 207 or under section 204. Decision will "be entered for respondent. The other laws here applicable, Revenue Acts of 1930 and 1938, sections 201-203, are substantially similar to Internal Revenue Code, section 201, which provides In part: “(a) Definition. — When used in this chapter the term ‘life insurance company’ means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident Insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds.” SEC. 202. GROSS INCOME OF LIFE INSURANCE COMPANIES. [[Image here]] (b) Reserve Funds Required by Law, Defined. — The term “reserve funds required by law” includes, in the case of assessment insurance, sums actually deposited by any company or association with State or Territorial officers pursuant to law as guaranty or reserve funds, and any funds maintained under the charter or articles of incorporation of the company or association exclusively for the payment of claims arising under certificates of membership or policies issued upon the assessment plan and not subject to any other use.