ARTHUR B. SURLOFF AND CHERI SURLOFF, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7306–80, 7319–80, 7324–80, 7326–80, 7338–80, 7344–80, 7353–80, 7361–80, 7379–80, 16025–80, 18308–80, 19379–80, 19381–80, 8360–81, 22074–81, 22075–81.      Filed August 31, 1983.

---

[1]Cases of the following petitioners are consolidated herewith: Irwin M. and Linda Potash, docket No. 7319–80; Sanford and Lyndol Siegal, docket No. 7324–80; Albert H. and Jane D. Nahmad, docket No. 7326–80; Norman C. and Nancy Liebman, docket No. 7338–80; Robert

*Charles L. Ruffner* and *Jerome J. Caplan*, for the petitioners.
*Roger D. Osburn*, for the respondent.

---

B. and Arlyn Katims, docket No. 7344–80; Herbert H. and Vivian M. Green, docket No. 7353–80; Harold and Vivian Beck, docket No. 7361–80; Sidney and Florence Fox, docket No. 7379–80; Richard S. and Harriet Wolfson, docket No. 16025–80; Lawrence M. and Roberta Marks, docket No. 18308–80; Howard L. and Carol Silverstein, docket No. 19379–80; Melvin M. and Inez Lesser, docket No. 19381–80; Morton and Brenda Korn, docket No. 8360–81; Hugh J. and Cheryl L. Connolly, docket No. 22074–81; and Louis and Marilyn Perry, docket No. 22075–81.

DRENNEN, *Judge*:* Respondent determined deficiencies in Federal income tax for the following taxpayers and for the taxable years as follows:

|  |  | Deficiencies | |
| --- | --- | --- | --- |
| Docket No. | Petitioners | 1976 | 1977 |
| 7306–80 | Arthur B. and Cheri Surloff | $24,459.00 | $3,308.00 |
| 7319–80 | Irwin M. and Linda Potash | 27,837.00 | 2,967.00 |
| 7324–80 | Sanford and Lyndol Siegal | 29,421.00 | --- |
| 7326–80 | Albert H. and Jane D. Nahmad | 10,301.00 | 1,575.00 |
| 7338–80 | Norman C. and Nancy Liebman | 12,649.00 | --- |
| 7344–80 | Robert B. and Arlyn Katims | 50,086.00 | --- |
| 7353–80 | Herbert H. and Vivian M. Green | 26,811.00 | --- |
| 7361–80 | Harold and Vivian Beck | 10,210.00 | --- |
| 7379–80 | Sidney and Florence Fox | 40,269.00 | --- |
| 16025–80 | Richard S. and Harriet Wolfson | 32,322.00 | --- |
| 18308–80 | Lawrence M. and Roberta Marks | 13,152.48 | 1,220.49 |
| 19379–80 | Howard L. and Carol Silverstein | 12,653.00 | --- |
| 19381–80 | Melvin M. and Inez Lesser | 25,874.00 | --- |
| 8360–81 | Morton and Brenda Korn | 12,234.00 | --- |
| 22074–81 | Hugh J. and Cheryl L. Connolly | 34,541.00 | --- |
| 22075–81 | Louis and Marilyn Perry | 41,930.00 | 37,906.00 |

After concessions, the issue for decision[2] is the amount, if any, that petitioners, as limited partners, are entitled to deduct as their distributive share of the losses and interest claimed by the respective partnerships in which they were limited partners. Resolution of this issue is dependent upon the following:

(1) Whether the partnerships are entitled to advanced royalty deductions;

(2) Whether the partnerships are entitled to deductions for amounts paid to the general partner;

(3) Whether the partnerships are entitled to deductions for amounts paid to an accounting firm to prepare its income tax returns;

(4) Whether the partnerships are entitled to interest deductions;

---

*This case was tried before Judge Sheldon V. Ekman, who died Jan. 18, 1982. By order of the Chief Judge, the case was reassigned to Judge William M. Drennen for disposition.

[2]With respect to those cases with docket Nos. 16025–80, 8360–81, 22074–81, and 22075–81, certain issues have been severed for purposes of trial. It will be necessary to try those issues separately unless the parties are able to reach a settlement, in which case a Rule 155 computation may be necessary.

(5) Whether the partnerships are entitled to deductions for amounts paid to offeree representatives; and

(6) Whether the partnerships are entitled to a deduction for amounts paid for certain tax advice.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

All of the petitioners herein were residents of Florida at the time their petitions were filed. The income tax returns for the periods involved were filed by each of the petitioners with the Office of the Internal Revenue Service at Chamblee, Ga.

This case involves eight limited partnerships, four of which subleased coal-bearing property located in Bell County, Ky., and are therefore sometimes hereinafter referred to as the Bell County partnerships, and four of which subleased coal-bearing property located in Knox County, Ky., and are therefore sometimes hereinafter referred to as the Knox County partnerships. Each of the partnerships was on the accrual basis of accounting, and each petitioner was a limited partner in one of the partnerships.[3]

Ted S. Finkel (Finkel) was the promoter of the Bell County partnerships. Finkel had obtained a copy of a coal tax shelter prospectus prepared by a New York law firm which indicated that investors could get multiple tax writeoffs from coal tax shelters. In March or April 1976, Finkel asked his attorney, Stanley H. Beck (Beck), to review the prospectus to determine whether it was correct regarding the availability of multiple

---

[3]In selecting the cases to be tried, counsel for petitioners and for respondent selected two petitioners from each partnership as cases representative of the other petitioners, which total more than 120 other investors, involving the same partnerships. Stipulations have been entered into and filed with the Court, and closing agreements have been entered into in the nondocketed cases, stipulating that, to the extent deductibility of deductions and/or distributable losses with regard to common issues for each of the eight partnerships is determined in a final decision of this Court, that decision shall be binding on the other taxpayers in the same partnership who are represented by Charles R. Ruffner, and upon respondent, with respect to such taxpayers and issues.

tax writeoffs. Beck agreed it was, so Finkel decided to proceed with the syndication of the limited partnerships.[4]

Shortly thereafter, Finkel and Beck attempted to locate coal properties that could be leased by the prospective limited partnerships. Finkel asked a friend, Sanford Kaplan (Kaplan), to help him locate some coal properties. Finkel learned through a relative that 1,055 acres of property were available in Bell County, Ky. He directed Beck to meet with Herbert Sandov (Sandov), one of the co-owners of the property, to discuss its possible acquisition. At that time, Sandov presented Beck with a copy of a coal report on the property which had been prepared by James H. Hagy (Hagy) in 1975.[5]

Since it was determined the partnerships would not be entitled to royalty deductions if they purchased the property outright, it was decided the property should be subleased. National Coal Leasing Corp. (National), a corporation solely owned by Kaplan, was formed (by Beck) to lease the property. National in turn was to then sublease the property to the partnerships.[6]

On July 5, 1976, National leased the 1,055 acres in Bell County, Ky. (hereinafter the Bell County property), from the owners.[7] National agreed to pay the lessors a royalty of $1 for each ton (2,000 pounds) of coal mined and removed from the property. National also agreed to pay a nonrefundable advanced royalty of $100,000. This advanced royalty was to be recouped and recovered by National at a rate of 50 cents per ton.[8] National had no obligation to mine coal or to pay additional royalties for a period of 4 years beginning on the

---

[4]Prior to forming the limited partnerships in issue, Finkel had been involved in the syndication of real estate ventures, but had no prior experience in the coal industry.

[5]Hagy prepared the report for his employer at that time, Harbert Construction Co. (Harbert). Harbert was a very large coal company that was mining coal in Bell County. At that time, it was considering purchasing the property, but it later decided not to do so.

[6]Finkel testified that although he made the initial contact with Sandov, he believed that he had an obligation to Kaplan to turn over the lead on the Bell County property. Therefore, it was Kaplan, not Finkel, who proceeded to lease the Bell County property. However, Finkel and Kaplan had no written contract to the effect that Kaplan would help Finkel obtain coal properties or that he would be compensated for finding such properties.

[7]Beck handled the negotiations for Kaplan and National with Sandov for the leasing of the Bell County property.

[8]Thus National would only pay the lessors 50 cents per ton for coal mined and removed from the property until 200,000 tons of coal had been mined. In this manner, National would recover the $100,000 advanced royalty.

date of the lease. Thereafter National was required to pay a minimum royalty of $40,000 per year. The duration of the lease was 10 years, and National had the option to extend the term for additional 1-year periods, provided it paid a minimum royalty of $100,000 for each year with respect to which the term of the lease was extended. If National failed to pay the required royalties, the lessors, at their option, could declare the lease forfeited and retake possession of the leased property.

By a "confidential offering memorandum" dated June 30, 1976, limited partnership interests in Amber Coal Co., Ltd. (Amber), were offered by Finkel to various investors. Although the "confidential offering memorandum" was dated June 30, 1976, Finkel actually began soliciting orders for limited partnership interests in Amber on June 4, 1976, which was prior to the time National had leased the Bell County property, and prior to the time Amber had subleased the property.[9]

To become a limited partner in Amber, each prospective investor was required to have a net worth of at least $200,000 and an annual income that would be subject at least in part to tax in the 50-percent bracket. The offering memorandum provided that 15 limited partnership interests were to be sold to limited partners for $14,000 each, for a total of $210,000. The group of limited partners acquiring the limited partnership interests were to receive 90 percent of the net profits, losses, deductions, and credits of Amber. The general partner of Amber was Finkel Investment Service, which was wholly owned by Finkel, and it contributed $7,000 for the remaining 10 percent of the net profits, losses, deductions, and credits of Amber.

Attached to the offering memorandum which was sent to the potential investors, were the following exhibits, each of which

---

[9]This finding is based upon a letter Finkel sent to a petitioner herein, in which he stated that he was putting together a situation which would result in "a writeoff for the first year that will probably be in the range of 3 or 4 to 1" and "after the first year you will receive income that would at least double your investment." On July 6, 1976, the same petitioner, who had since invested $14,000 in Amber, received a letter summarizing his tax writeoff. The letter showed an approximate tax writeoff or deduction of $56,000 for 1976, which using a 50-percent tax bracket resulted in a net tax savings of $28,000. The letter then concluded that since petitioner invested $14,000 and his tax savings would be $28,000, he had a first year "profit" of $14,000.

will be discussed more fully herein: Report on coal property, proposed coal sublease agreement, tax opinion letter, and limited partnership agreement.

The report on the coal property was based upon the coal report for the Bell County property, which had been prepared in 1975 by Hagy. The report estimated that the total recoverable coal reserves on the Bell County property were 4,239,029 tons,[10] of which 3,971,275 tons were considered recoverable by underground mining and the remainder were considered recoverable through strip mining and auger mining.[11]

The proposed coal sublease agreement dated July 27, 1976, provided that Amber would sublease 250 acres of the Bell County property from National.[12] Amber agreed to pay National $2 for each net ton (2,000 pounds) of coal mined and removed from the property and also agreed to pay a nonrefundable advanced royalty to National of $788,000, of which $116,000 was paid in cash and $672,000[13] by a promissory note.[14] The promissory notes specifically stated that they were nonrecourse and that in the event of default the sole remedy of the payee was to terminate and cancel the sublease.[15] Amber was not to be considered in default of the payment of principal

---

[10]Respondent's expert estimated that there were only 775,888 tons of recoverable coal reserves underlying the Bell County property.

[11]The auger mining method of extracting coal involves boring a series of parallel horizontal holes into the coal seam, after the seam has been exposed by strip mining. This method is often used when the overburden is too large to permit economical strip mining.

[12]Beck divided the Bell County property into quadrants, and Amber leased one of the quadrants or approximately 250 acres. Beck believed that the coal was uniformly present throughout the property and that by dividing the property into quadrants and then leasing one-fourth of the property to Amber, the partnership would have the right to mine one-fourth of the total estimated recoverable tons of coal. Petitioners now concede that the coal did not run uniformly throughout the entire Bell County property.

[13]Based on Hagy's coal report, Beck believed that Amber had approximately 1 million tons of recoverable coal reserves (4,239,029 ÷ ¼ interest Amber held). Beck further believed that the Internal Revenue Service would not permit the tonnage against which the advanced royalty would be recouped, to exceed 80 percent of the estimated reserves. Therefore, Beck decided that Amber would pay a royalty of $788,000, which was recoverable against 788,000 tons of coal at $1 per ton, which was less than 80 percent of Amber's estimated reserves of approximately 1 million tons.

[14]At the time of trial, no principal or interest payments had ever been made by Amber on the nonrecourse promissory notes.

[15]Beck, who had negotiated National's lease of the Bell County property, negotiated the sublease of this same property for Amber from National. Neither the fact of Beck's dual representation nor the facts surrounding the acquisition of the properties by Kaplan were disclosed in any of the offering memoranda.

or interest on the promissory notes unless such default had continued for a period of at least 48 months. The promissory notes further provided that they were payable with interest at the rate of 8 percent per annum in equal installments, so as to amortize the obligations over a period of 10 years from the date thereof.

The advanced royalty of $788,000 paid by Amber was to be recouped out of the $2-per-ton royalty otherwise due and payable, at the rate of $1 per ton of coal mined and removed from the property. Accordingly, as to the first 788,000 tons of coal mined and removed, the royalty payment of $2 per ton would be reduced to $1 per ton, so that after 788,000 tons of coal had been mined, all advanced royalties would have been recouped and recovered.[16]

Amber had no obligation to mine the property or pay any additional royalties for a period of 4 years beginning on the date of the lease.[17] Thereafter, Amber was required to pay a minimum royalty of $40,000 per year, which was recovered at the rate of $2 per ton.[18] The duration of the sublease was for 10 years and thereafter Amber had the option to renew the sublease by paying a minimum royalty of $100,000 per year.[19] To recoup the advanced and minimum royalties, Amber would have to mine a total of 908,000 tons of coal over the 10 years of the lease.[20]

---

[16]The royalties Amber agreed to pay for exceeded the fair market value of the underlying property. Hagy testified that the Bell County property had a fair market value of $200 per acre in fee, which we accept. Using this figure, the fair market value of the property would be $50,000 for 250 acres; yet Amber agreed to pay much more in advanced royalties in the first year of the lease just for the right to mine the property.

[17]Notwithstanding this provision, Amber, after first mining, removing, and selling 116,000 tons of coal from the Bell County property, was required to pay the sum of $1 per ton on the promissory note obligation for each additional ton of coal mined, removed, and sold from the property. This payment served as a prepayment on the $672,000 promissory note. This provision in effect forced the limited partners to make payments on the nonrecourse note if and when they mined over 116,000 tons of coal.

[18]On Dec. 12, 1979, this provision was amended. Pursuant to this amendment, Amber was required to pay only $10,000 per year for years 5, 6, and 7 of the sublease, and $15,000 for years 8, 9, and 10 of the sublease.

[19]With the exception of the number of acres leased and the amount of the minimum royalties, the sublease entered into by Amber with National was identical to the lease entered into between National and the owners of the Bell County property.

[20]Specifically, Amber would have to mine 788,000 tons of coal to recover the advanced royalty of $788,000 (788,000 tons × $1 per ton) and 120,000 tons of coal to recover the $40,000 royalties paid in years 5 thru 10 of the sublease ($40,000 × 6 years × $2 per ton).

The confidential offering memorandum required the prospective investors to select offeree-representatives to assist them in evaluating the risks of investing in the limited partnerships before they were allowed to purchase a limited partnership interest. The offeree-representatives selected by the investors were required to have such knowledge and experience in financial, tax, and business matters that would enable them to evaluate the risks of investing in Amber.[21] Amber paid the offeree-representatives 10 percent of the amount the investor decided to invest, but if the potential investor decided not to invest in Amber, then Amber did not pay the offeree-representative anything.[22]

The tax opinion letter provided that it was expected that Amber would be able to sell the coal it mined for $16 per ton and that the cost of mining such coal would be $13 per ton plus the $2-per-ton royalty, which would yield a $1-per-ton profit.[23]

The offering prospectus for Amber provided that Amber would hire contract miners to mine the coal property. However, at the time Amber was syndicated, no contract miners had been hired to do any mining for the partnerships.[24]

The limited partnership agreement for Amber provided that the general partner was to receive commencement fees as a guaranteed payment pursuant to section 707(c)[25] of $50,000. The payment purportedly served as compensation to the general partner for its services rendered in connection with the production and sale of 50,000 tons of coal, to be mined and

---

[21]It was not suggested that the offeree-representative have knowledge of or experience in the coal business.

[22]The limited partners invested a total of $210,000 in Amber, and thus the offeree-representatives received payments totaling $21,000.

[23]These figures were purportedly based upon information provided by Hagy to Finkel and Beck. Hagy told Finkel and Beck that Harbert was able to sell the coal for $16 per ton and that it was mining the coal for $12 per ton exclusive of the royalties. However, Hagy informed Finkel and Beck that their mining costs would vary depending on coal thickness, topography, etc., and that the selling price would vary depending on quality. Hagy also told Finkel and Beck that if it were his property, he would do additional exploratory work before mining the property, but this advice was ignored. The confidential memorandum stated that the partnership intended to do additional exploratory work before extraction of the coal. This was not done.

[24]Sometime around July 1976, before Amber was syndicated, Finkel, Beck, and Kaplan requested Hagy to try to locate contract miners for the property. Hagy informed them that he was having trouble finding contract miners who had equipment to do the mining.

[25]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue.

sold by the partnership. The payment however was not conditioned upon the actual production and sale of coal. Furthermore, the general partner was to receive as management compensation the amount of 10 cents per ton for all coal mined and sold after Amber had first mined and sold 50,000 tons of coal. The fee paid to Finkel Services, Inc., also included compensation for selling the limited partnership interests, as well as for attempting to find contract miners and raising the money to get the operation started.

Shortly after Amber was syndicated, three additional limited partnerships were syndicated. These were Blue Coal Co. (Blue), Diamond Coal Co. (Diamond), and Emerald Coal Co. (Emerald). Each of these partnerships, except Emerald, subleased 250 acres of the Bell County property for the same amount as Amber had paid.[26] In virtually all respects, these Bell County partnerships were identical to Amber.[27] However, at the time these additional partnerships were formed, Finkel was aware that contract miners were not available to mine the property.

Each Bell County partnership paid $12,000 to Beck for the services he rendered as attorney for the Bell County partnerships.[28] Beck's activities with respect to each partnership included advising Finkel concerning the formation of the partnerships, preparation of the prospectus and the documents contained therein including the legal opinion,[29] negotiating with Sandov for the acquisition of the Bell County property, and talking with offeree-representatives who were advising potential investors. Beck allocated $10,000 of his $12,000 legal fee charged to each Bell County partnership for tax advice and preparing the tax opinion letter and also for meeting with the offeree-representatives and explaining the

---

[26]Emerald subleased 305 acres. All of the subleases were executed on or before Oct. 27, 1976.

[27]The limited partners in Diamond and Emerald paid a total of $224,000 and the general partner paid $2,000 as contrasted with the $210,000 and $7,000 paid by each group in Amber and Blue.

[28]National paid Beck $52,000 for the services he rendered in negotiating the lease with Sandov on the Bell County property or $13,000 per partnership.

[29]The legal opinion was a 36-page tax opinion prepared by Beck concerning the Federal income tax consequences of the limited partnerships. This tax opinion was included in the prospectus of each Bell County partnership and mailed to potential investors.

economics and the tax consequences of investing in the partnership.

The Bell County partnerships paid out the advance (cash) royalties, general partner commencement fees, attorney fees, and offeree-representative fees soon after they were formed. After these cash payments were made, Amber and Blue had only $18,000 available for working capital, and Diamond and Emerald had $25,600 available for working capital.

The money paid to Finkel, Beck, and Kaplan was based upon the amount of money they felt they could raise. Finkel believed he could raise $200,000 from a limited partnership of this size. Kaplan wanted $125,000 per partnership, Finkel wanted $50,000 per partnership, and Beck wanted a fee of $25,000 per partnership. It was decided that Kaplan would get $116,000 per partnership and would pay $13,000 per partnership of the $25,000 Beck received, and that Finkel would get $50,000 per partnership.[30] The balance of the money raised went to working capital and the offeree-representative fees.[31]

On or about June 22, 1976, Finkel, Beck, and Kaplan became aware that 770 acres of property located in Knox County, Tenn. (hereinafter the Knox County property), contiguous to the Bell County property, might be available for purchase.

Throughout the summer of 1976, Finkel, Kaplan, and Beck discussed the possibility of acquiring the property and forming more limited partnerships.[32] On October 6, 1976, Kaplan paid

---

[30]It appears that Finkel, Beck, and Kaplan, instead of being paid for the fair market value of the services rendered, were instead paid based on how much money was available to divide among themselves.

[31]The following table summarizes the amount of cash money paid into the Bell County partnerships and how that money was distributed:

| Partnership | Cash paid in | | Royalties (National) (Kaplan's corp.) | General partner commence- ment fees (Finkel's corp.) | Offeree- represent- atives | Attorney fees (Beck) | Working capital |
|---|---|---|---|---|---|---|---|
| | Limited partners | General partner | | | | | |
| Amber | $210,000 | $7,000 | $116,000 | $50,000 | $21,000 | $12,000 | $18,000 |
| Blue | 210,000 | 7,000 | 116,000 | 50,000 | 21,000 | 12,000 | 18,000 |
| Diamond | 224,000 | 2,000 | 116,000 | 50,000 | 22,400 | 12,000 | 25,000 |
| Emerald | 224,000 | 2,000 | 116,000 | 50,000 | 22,400 | 12,000 | 25,000 |

[32]In connection with the proposed acquisition of the property, Kaplan commissioned Hagy and Fred Ore (Ore) to prepare a report estimating the amount of reserves contained in the property.

White Log Jellico Coal Co., Inc. (Jellico), and/or Edd and Closter Detherage, the owners of the property, $5,000 for a 60-day option to purchase the Knox County property at a purchase price of $140,000.[33]

On November 4, 1976, Kaplan exercised his option to purchase the Knox County property for $140,000. The next day he leased it to Georgia National Coal Co., Inc. (Georgia), his solely owned corporation.[34] Under the lease, Georgia agreed to pay Kaplan a royalty of $2 for each net ton of coal mined and removed from the property, and a nonrefundable advanced minimum royalty of $300,000 per year payable by promissory note for the 7-year term of the sublease. Each nonrefundable advanced minimum annual royalty payment was to be recouped by Georgia at the rate of $2 per ton of coal mined and removed from the property.

On or about November 7, 1976, Finkel began promoting four more limited partnerships by the names of Crystal, Indigo, Jade, and Silver (hereinafter collectively referred to as the Knox County partnerships), which would sublease the Knox County property from Georgia.[35] The general partner and promoter of each of the Knox County partnerships was Finkel.

As was the case with the Bell County partnerships, a confidential offering memorandum was sent to the various potential investors of the Knox County partnerships. For each of the Knox County partnerships, 16½ limited partnership interests were sold for $14,500 each, for a total of $239,250 ($125,250 for Silver). The group of limited partners acquiring the limited partnership interests received 92 percent of net profits, losses, deductions, and credits of the Knox County partnerships. Finkel, the general partner, contributed $2,000

---

[33]With respect to the transaction, Kaplan was represented by Beck and Kenneth Bloom, an attorney-associate of Beck's, along with counsel in Kentucky.

[34]Georgia was formed at that time by Beck, with Kaplan as its sole shareholder, for the sole purpose of leasing the Knox County property.

[35]Each of the Knox County partnerships were virtually identical in all material respects to each other. However, Silver leased one-half as much property as the other Knox County partnerships, and one-half as much money was paid in by investors, and Silver generally paid out one-half as much money as the other Knox County partnerships for such things as advanced minimum royalties, general partner commencement fees, and attorney fees.

for the remaining 8 percent of the net profits, losses, deductions, and credits of the Knox County partnerships.

Attached to the offering memorandum which was sent to potential investors, were the same exhibits which were attached to the offering memorandum sent to the Bell County investors, which include the following: Report on coal property, proposed coal sublease agreement; tax opinion letter, and the limited partnership agreement.[36]

The report on the coal property was based upon the report prepared by Hagy and Ore and estimated that there were 7,096,652 tons of recoverable coal or approximately 2,030,000 tons for each Knox County partnership, except Silver which had approximately 1,015,000 tons.

The proposed coal sublease agreements, all of which were executed after October 29, 1976, provided that each Knox County partnership would sublease approximately 220 acres of the Knox County property from Georgia, except Silver, which would sublease 110 acres.[37] The subleases provided that their term was 7 years and that a royalty of $2.87 per ton of coal mined and removed from the property plus an additional percentage royalty equal to 10 percent of the selling price of all coal mined, removed, and sold by the partnership to the extent that the price of coal exceeded $20 per ton, would be paid.[38] The subleases further provided that a nonrefundable advanced minimum royalty of $832,300 was required to be paid by each Knox County partnership as follows (except Silver, which paid one-half as much): The sum of $110,000, evidenced by a promissory note in such amount ($55,000 for Silver), and the sum of $722,300, evidenced by a promissory note in such amount ($361,150 for Silver). The subleases provided that this same amount was to be paid as a minimum

[36]For the most part, the offering memorandum and attached exhibits for the Knox County partnerships were identical to those for the Bell County partnerships. Therefore, we have limited our discussion to the pertinent differences that existed between the Knox County and Bell County partnerships.

[37]Again, as was the case with the Bell County partnerships, the property was divided by Beck on the basis of acreage and each partnership leased separate and distinct parts of the Knox County property.

[38]On Dec. 11, 1976, Georgia and the Knox County partnerships amended their subleases to provide that the royalty payable would be $2 per ton instead of $2.87 per ton.

royalty every year by two new uniform notes of $110,000 and $722,300.[39] Payment on the notes was to be made in equal monthly installments sufficient to amortize principal and interest of 6 percent per annum for the $722,300 notes and 10 percent per annum for the $110,000 notes.[40] The $110,000 ($55,000 for Silver) notes were paid in cash in 1976 by each partnership.

The $722,300 and $110,000 notes to be executed each year by the Knox County partnerships (one-half as much for Silver) were not to be considered in default in the payment of any installment of principal and/or interest unless the default had continued for a period of 48 months. For the notes delivered in the fifth year, the grace period was 36 months, for the sixth year, it was 24 months, and for the seventh year, it was 12 months.[41] In the event of default of the payor, the only remedy of the payee was to terminate and cancel the sublease.

The advanced minimum royalties to be paid by the Knox County partnerships were to be recouped at the rate of $2.87 per ton of coal mined and removed from the property. Accordingly, these partnerships would not pay any royalties whatsoever until such time as they had fully recovered the advanced minimum royalties.

To recoup the royalties, the Knox County partnerships would have to mine a total of 7,105,000 tons of coal, which was approximately 100 percent of the estimated tons of recoverable coal according to Hagy's and Ore's reports.[42]

---

[39]Shortly before the subleases of the Knox County property were entered into, the Internal Revenue Service issued a news release containing a proposed regulation which affected the current deductibility of advanced royalties. Generally speaking, it provided that advanced royalties would be deductible currently only if they constituted minimum annual royalties payable annually over the life of the lease. See News Release I.R. 1687, Oct. 29, 1976. Subsequent to the news release, the proposed subleases for the Knox County partnerships to be formed were changed in an attempt to comply with the proposed regulation in case it was adopted. Specifically, the proposed subleases were changed to provide for advanced minimum annual royalties to be paid by nonrecourse notes each year.

[40]No cash or principal or interest payments have ever been made on these nonrecourse notes, with the exception of the cash prepayment of $110,000 ($55,000 for Silver) made in 1976. Furthermore, for years after 1976, petitioners were unable to find any notes that had ever been executed.

[41]Notwithstanding the grace period provided by the subleases, the partnerships had to pay $2.87 per ton of coal mined, removed, and sold from the subleased property, which payment was to serve as a prepayment with respect to the obligations evidenced by the promissory notes and served to reduce such obligations.

[42]All the Knox County partnerships agreed to pay $832,300 per year for 7 years, except Silver, which agreed to pay $416,150. Thus, the Knox County partnerships were each

As was the case with the Bell County partnerships, the confidential offering memorandum required each prospective investor to select an offeree-representative to assist in evaluating the risks of investing in the limited partnerships before being allowed to invest in a partnership. For these services, the offeree-representatives were paid by the particular Knox County partnership in which the investor decided to invest, 10 percent of the amount invested by that partner.

The tax opinion letter provided that the partnerships had been advised by Hagy that the current selling price of the coal was approximately $16 per ton, and that the mining costs had been estimated at $12.25 per ton,[43] which cost when added with the $2.87-per-ton royalty would yield an 88-cents-per-ton profit.[44]

The offering prospectus for each of the Knox County partnerships provided that they would hire contract miners to mine the coal property. However, at the time the partnerships were syndicated, no contract miners had been hired to do any of the mining, and Finkel still had not been successful in finding contract miners for any of the Bell County partnerships.

The limited partnership agreement for each of the Knox County partnerships provided that Finkel, as general partner, would receive commencement fees as a guaranteed payment, pursuant to section 707(c), of $70,000, purportedly for services

---

obligated to pay a total of $5,826,100 in advanced minimum royalties ($2,913,050 for Siver), ($832,300 × 7 years for the Knox County partnerships, except Silver which paid $416,150 × 7 years). Combined, the Knox County partnerships agreed to pay a total of $20,391,350 in advanced minimum royalties. $5,826,100 × 3 Knox County partnerships, plus $2,913,050 for Silver). This royalty was to be recovered at a rate of $2.87 per ton. Therefore, to recover the advanced minimum royalties, the Knox County partnerships had to mine a total of 7,105,000 tons of coal. ($20,391,350 ÷ $2.87), whereas total estimated reserves were 7,096,652 tons.

[43]The tax opinion letter advised that Hagy had estimated that the cost of mining would actually be between $11.50 and $13 per ton depending on the mining method employed. The partnerships then used the figure of $12.25 in calculating how much profit per ton the Knox Partnerships would make. For the Bell County partnerships, the tax opinion letter used the cost of $13 per ton. Petitioners have not explained why the Knox County partnerships decided that the coal in question could be mined for a lesser amount than the Bell County property.

[44]While these figures were purportedly based upon information provided by Hagy to Finkel and Beck, Hagy testified that he could not tell them how much it would cost to mine the coal without investigating further, which he did not do.

rendered in connection with the mining and sale of 70,000 tons of coal.[45] Furthermore, the general partner was to receive as management compensation, the amount of 10 cents per ton for all coal mined and sold after the Knox County partnerships had first mined and sold 70,000 tons of coal. The fee paid to Finkel included compensation for selling limited partnership interests, as well as finding contract miners.

Each Knox County partnership paid $12,000, except Silver which paid $6,000, to Beck for services he rendered as attorney for the Knox County partnerships.[46] It appears the services which Beck performed with respect to the partnerships were identical to those he performed for the Bell County partnerships. Beck again allocated $10,000 of his $12,000 legal fee charged to each Knox County partnership for tax advice and preparing the tax opinion letter, and also for meeting with the offeree-representatives and explaining the economics and tax consequences of investing in the partnership.

After the Knox County partnerships prepaid the $110,000 promissory note given for advanced royalties, and paid general partner commencement fees, attorneys' fees, and offeree-representatives' fees, each Knox County partnership had $25,250 for working capital, except Silver, which had $16,750.[47] The money that Finkel, Beck, and Kaplan each received was again divided on the basis of how much money was available to split between them.

Other than requesting Hagy to look for contract miners, the only affirmative act by Finkel and Beck in 1976 concerning getting the property mined for both the Bell and Knox County

---

[45]This provision was identical to that in the Bell County limited partnership agreements, except the initial compensation was $70,000 instead of $50,000.

[46]In addition, Beck received $45,500 from Georgia, or $13,000 per partnership, except for Silver, for which $6,500 was paid.

[47]The table below summarizes the amount of cash money paid into the Knox County partnerships and how that money was disbursed.

| | Cash paid in | | Prepaid advanced minimum royalties | General partner commence- ment fees | Offeree- represent- atives | Attorney fees | Working capital |
|---|---|---|---|---|---|---|---|
| Partnership | Limited partners | General partner | | | | | |
| Crystal | $239,250 | $2,000 | $110,000 | $70,000 | $24,000 | $12,000 | $25,250 |
| Indigo | 239,250 | 2,000 | 110,000 | 70,000 | 24,000 | 12,000 | 25,250 |
| Jade | 239,250 | 2,000 | 110,000 | 70,000 | 24,000 | 12,000 | 25,250 |
| Silver | 125,250 | 2,000 | 55,000 | 35,000 | 12,500 | 6,000 | 16,750 |

partnerships was to make an inquiry with a company in 1976 concerning the cost of exploratory drilling. Finkel received a response dated September 27, 1976, setting forth the costs to do such exploratory drilling, but Finkel decided against getting the work done.

In the spring of 1977, Finkel received a call from the State investigator for the comptroller's office for the State of Florida, securities division, asking that the records with respect to the Bell and Knox County partnerships be turned over pursuant to an investigation the State was conducting. The records were turned over on May 27, 1977. Only after the investigation was begun was anything concrete done in the way of actually getting an engineer to do exploratory work.

During 1976, none of the Bell or Knox County partnerships mined any coal. On September 28, 1977, all eight partnerships collectively entered into a contract with E. J. Moses (Moses), a contract miner, to mine a total of 50,000 tons of coal, an average of 6,250 tons of coal per partnership. Moses was to receive 85 percent of the proceeds from the sale of any coal he mined, and the partnerships were still required to pay all royalties on the coal mined. It is not clear how much coal, if any, was mined by Moses in 1977 or subsequent thereto. Finkel testified that it was because of floods and a lawsuit brought by the owners of the Bell County property, that Moses did not mine much coal on the properties.

On September 25, 1979, the partnerships entered into a contract with Somerset Mining Co., Inc., to mine the coal on the Bell and Knox Counties properties.[48] The partnerships paid a total of $50,000 to Somerset to initiate exploration on the property. Somerset was to pay the partnerships a total of $3 per ton for each ton of coal it sold. This contract was later canceled and no coal was ever mined by Somerset.[49]

---

[48]In early 1978, the Internal Revenue Service began an investigation of the limited partnerships. During the investigation, Finkel was informed by the accountant handling the audit on behalf of the partnerships that the lack of mining by the partnerships would be a detriment during the audit. It was subsequent to this time that the partnerships entered into the contract with Somerset.

[49]In subsequent years, the partnerships entered into an additional contract with another company to mine the coal. However, no coal whatsoever has been mined under this contract.

| Partnership | Management compensation[50] | Interest[51] | Royalties | Other deductions Tax consultation[52] | Other consultation | Accounting expenses[53] |
|---|---|---|---|---|---|---|
| Amber | $25,000 | $23,124 | $788,000 | $30,300 | $200 | $1,000 |
| Blue | 25,000 | 23,124 | 788,000 | 31,000 | 200 | 1,000 |
| Diamond | 25,000 | 11,341 | 788,000 | 32,400 | --- | 1,000 |
| Emerald | 25,000 | 9,574 | 788,000 | 31,700 | --- | 1,000 |
| Crystal | 35,000 | 4,693 | 832,300 | 33,925 | --- | 1,000 |
| Indigo | 35,000 | 5,356 | 832,300 | 33,925 | --- | 1,000 |
| Jade | 35,000 | 1,932 | 832,300 | 33,925 | --- | 1,000 |
| Silver | 17,500 | 713 | 416,150 | 16,600 | --- | 1,000 |

[50] The partnerships claimed one-half of the management fees paid to Finkel or Finkel, Inc., in 1976, and the other one-half in 1977.

[51] The amounts claimed for interest were amounts allegedly accrued on the nonrecourse notes given to National and Georgia by the partnerships.

[52] The tax consultation was composed of the $10,000 paid to Beck, and the remainder was for the amounts paid to offeree-representatives.

[53] The amounts claimed for accounting expenses were for preparation of the partnerships' income tax returns.

The Bell and Knox Counties partnerships on their 1976 income tax returns claimed the deductions shown in the table on page 227. For 1976, the Bell and Knox partnerships reported total receipts of zero. Thus, as a result of the deductions shown on page 227, the Bell and Knox partnerships reported losses on their 1976 tax returns as follows:

| Partnership | 1976 |
|---|---|
| Amber | ($867,624) |
| Blue | (867,624) |
| Diamond | (857,741) |
| Emerald | (855,274) |
| Crystal | (906,918) |
| Indigo | (907,581) |
| Jade | (904,157) |
| Silver | (451,963) |

The Knox County partnerships on their 1977 income tax returns claimed the following deductions:[54]

| | Guaranteed payments to | | Other deductions | | |
|---|---|---|---|---|---|
| Partnership | partners | Interest | Minimum royalties | Misc. | Accounting expenses |
| Crystal | $35,000 | $48,995 | $832,300 | $235 | $1,000 |
| Indigo | 35,000 | 48,995 | 832,300 | 135 | 1,000 |
| Jade | 35,000 | 45,571 | 832,300 | 135 | 1,000 |
| Silver | 17,500 | 22,488 | 416,150 | 135 | 1,000 |

The Knox County partnerships reported total receipts of zero. Thus, as a result of the above deductions, the Knox County partnerships reported losses on their 1977 tax returns as follows:

| Partnership | 1977 |
|---|---|
| Crystal | ($917,530) |
| Indigo | (917,430) |
| Jade | (914,006) |
| Silver | (457,273) |

For the taxable years 1976 and/or 1977 petitioners deducted their pro rata share of the losses and interest claimed by the partnerships. Respondent disallowed these deductions in their entirety.

---

[54] The determined deficiencies for 1977 relate only to limited partners of the Knox County partnerships. Therefore, only the deductions, gross receipts, and losses of the Knox County partnerships are set forth.

OPINION

## 1. Royalty Deductions

The petitioners in these consolidated cases are all limited partners in one of eight limited partnerships formed in 1976 ostensibly to mine coal from two tracts of land, one containing 1,055 acres located in Bell County, Ky., and the other containing 770 acres located in Knox County, Tenn., which were either near to or adjacent to each other. Four limited partnerships (the Bell County partnerships) each leased approximately one-fourth of the total acreage in Bell County, and three of the other four each leased approximately 220 acres of the Knox County acreage with the fourth leasing approximately 110 acres of that property (the Knox County partnerships). The promoters of these partnership projects were Finkel, a real estate adventurer who had no experience in the coal business, and his attorney, Beck, who also had no experience in the coal business. The general partner in each of the eight partnerships was either Finkel or his wholly owned corporation, Finkel Services, Inc. The properties were subleased from two corporations wholly owned by Kaplan, a friend of Finkel, which had recently been formed to either buy or lease the properties.

The issue in these cases is whether the limited partners are entitled to deduct their allocable shares of the losses incurred by the partnerships in 1976 (and 1977 for the Knox County partnership) resulting from the facts that no coal was mined but the partnerships incurred various expenses including advanced royalties, commencement fees paid to the general partner, attorney fees paid to Beck, offeree-representative fees paid to someone, and accrued interest (not paid). The principal item involved is the advanced royalties, a part of which ($116,000 for each Bell County partnership, $110,000 for three of the Knox County partnerships, and $55,000 for the fourth Knox County partnership) was paid in cash out of the cash contributions of the partners, and the balance of which ($672,000 for each Bell County partnership, $722,300 for three of the Knox County partnerships, and $361,150 for the fourth Knox County partnership) was represented by nonrecourse notes which were payable only out of the tonnage royalties due on the coal as it was mined. After the cash payment of the "up-

front" obligations, two of the Bell County partnerships retained $18,000 (out of $217,000 of cash contributed by the partners) as working capital, and the other two retained $25,000 (of the $226,000 cash contributed) as working capital; the three Knox County partnerships each retained $25,250 (out of $241,250 cash contributed), and the fourth retained $16,750 (out of $127,250 cash contributed) as working capital.

To put these issues in better perspective, we first note that 1.612–3(b)(3), Income Tax Regs., which deals with the deductibility of coal royalties[55] was amended in December 1977, retroactive to October 29, 1976.[56] The regulation prior to amendment gave the payor of advanced royalties paid or accrued the option of treating them either (1) as deductions from gross income for the year in which paid or accrued or (2) as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, was sold. See also Rev. Rule 70–20, 1970–1 C.B. 144, and Rev. Rule 74–214, 1974–1 C.B. 148, both of which were revoked by Rev. Rule 77–489, 1977–2 C.B. 177. The amended regulation provides that the payor of advanced royalties should treat them as deductions from gross income for the year the mineral product, with respect to which the advanced royalties were paid or accrued, is sold. However, an exception to this rule was provided in the case of advanced mineral royalties paid or

---

[55]Royalties are deductible under sec. 162, I.R.C. 1954, and partnership losses would be deductible under sec. 165. Sec. 612 relates to the basis for depletion of minerals.

[56]Sec. 1.612–3(b)(3), Income Tax Regs., prior to its amendment effective Oct. 29, 1976 (see T.D. 7523, 1978–1 C.B. 192, published Dec. 19, 1977) provided in part:

(3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows:

(i) As deductions from gross income for the years the advanced royalties are paid or accrued, or

(ii) As deductions from gross income for the year the mineral product in respect of which the advanced royalties were paid, is sold. * * *

After the amendment the section provided in part as follows:

(3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. * * * However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. * * * For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually over the life of the lease or for a period of at least 20 years * * *

accrued as a result of a *minimum royalty provision* which gave the payor the option to treat the advanced royalties as deductions from gross income for the year in which they were paid or accrued. A minimum royalty provision was defined as a provision that "requires that a substantially uniform amount of royalties be paid at least annually over the life of the lease or for a period of at least 20 years."

Since all of the Bell County partnerships were formed and their leases were executed prior to October 29, 1976, the effective date of the amendment to the regulation, but all the Knox County partnerships were formed and their leases were executed subsequent to October 29, 1976, it would appear that if the regulation is controlling as to the advanced royalty issue in these cases, the preamendment regulation should be applied to the Bell County partnerships and the postamendment regulation should be applied to the Knox County partnerships.

Respondent admits that under the preamendment regulation and the two revenue rulings cited above, the Bell County partnerships may deduct those portions of the advanced royalties paid *in cash* in 1976 that are proven to qualify as advanced royalties; however, he argues that the rulings were erroneous. Respondent further argues that the nonrecourse notes were shams and nullities and did not constitute royalties. See *Wing v. Commissioner*, 81 T.C. 17 (1983).

Petitioners argue that the Bell County partnerships may deduct the entire amount of the advanced royalties paid or accrued (cash and notes) in 1976 under the old regulation and the revenue rulings, and that the Knox County partnerships may also deduct the entire amount of the advanced royalties paid or accrued in 1976 and 1977 (cash and notes) because the amended regulation, if applied retroactively, is invalid because the issuance thereof violated the Administrative Procedure Act and the Legislative Reenactment Doctrine. In *Wendland v. Commissioner*, 79 T.C. 355 (1982), on appeal (9th Cir. and 11th Cir., June 8, 1983), decided after the briefs in this case were filed, this Court held that in amending 1.612–3(b)(3), Income Tax Regs., respondent did comply with the purposes behind the Administrative Procedure Act, and that amending the regulation retroactively was a valid exercise of respondent's authority under section 7805(b); and that the Legislative Reenactment Doctrine did not apply to bar respondent from

amending the regulation. These conclusions were affirmed in *Wing v. Commissioner, supra.* Consequently, for the Knox County partnerships to be entitled to treat any of the advanced royalties paid or accrued in 1976 or 1977 as deductions in those years in which no coal was mined or sold, they would have to prove that the royalties were paid or accrued as a result of a "minimum royalty provision" as defined in the amended regulation.

However, respondent's principal argument on this issue is that the partnerships had no actual and bona fide objective of making a profit from these coal ventures; that their dominant objective was to provide tax deductions for the investors; that they therefore were not in the trade or business of mining or selling coal, and hence are not entitled to deduct the royalties at all. Petitioners dispute this, claiming that both the investors and the partnerships had as their primary objectives the making of a profit. Respondent also claims that the nonrecourse notes given as a part of the advanced royalties were shams and nullities that were never intended to be paid but were given for the sole purpose of creating tax deductions for the investors, and therefore, do not qualify as advanced royalties.

Since the issue of whether the partnerships were engaged in a trade or business so as to be entitled to a deduction for royalties as business expenses raises a question which must be answered in the affirmative before consideration need be given to many of the other arguments on this issue, we will address it first.

Royalties have been described as akin to rent and are deductible by the payor as a trade or business expense under section 162(a)(3). *Commissioner v. Jamison Coal & Coke Co.*, 67 F.2d 342 (3d Cir. 1933); *Bennet v. Hutchinson Coal Co.*, 64 F.2d 275 (4th Cir. 1933); *Buffalo Eagle Mines, Inc. v. Commissioner*, 37 B.T.A. 843 (1938). Under the circumstances here, the deduction, if allowable, would be allowable to the partnerships rather than directly to the partners. In order to constitute the carrying on of a trade or business, the partnerships must have entered into the coal venture, "in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom," *Hersh v. Commissioner*, 315 F.2d, 731, 736 (9th Cir. 1963), affg. a memorandum opinion of this Court;

*Brannen v. Commissioner*, 78 T.C. 471 (1982), on appeal (11th Cir., August 23, 1982). Also, the partnerships must have been operated with the actual and honest objective of making a profit. *Dreicer v. Commissioner*, 78 T.C. 642 (1982), affd. in an unpublished opinion February 22, 1983. "The test for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162 is whether the individual's primary purpose and intention in engaging in the activity is to make a profit." (Citations omitted.) *Golanty v. Commissioner*, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). "While a reasonable expectation of profit is not required, a taxpayer's profit objective must be bona fide." *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983).

As used in this context "primary" means "of first importance" or "principally," *Jefferson v. Commissioner*, 50 T.C. 963, 968 (1968), citing *Malat v. Riddle*, 383 U.S. 569, 572 (1966), and "profit" means economic profit, independent of tax savings. *Shapiro v. Commissioner*, 40 T.C. 34 (1963).

The burden of proof is on petitioners to show that the partnerships were engaged in the coal business with the dominant objective of realizing a profit. Rule 142(a).[57] In making this determination, all relevant facts and circumstances are to be taken into account. *Golanty v. Commissioner, supra*; *Jasionowski v. Commissioner*, 66 T.C. 312 (1976). Greater weight should be given to objective facts than to mere statements of intent. *Dreicer v. Commissioner, supra* at 645. In determining whether the requisite profit motive was present, we are required to look at the partnership level (*Brannen v. Commissioner, supra*), and cases cited and discussed therein. This means that we must focus our attention on the motives and objectives of the promoters and general managers of these partnerships.[58]

---

[57]All references to Rules are to the Tax Court Rules of Practice and Procedure.

[58]While the intentions and objectives of the limited partners may have some relevance, the partnership itself is the entity that is or is not in a trade or business, and which must prove that it is entitled to the deduction for advanced royalties. It is doubtful that any of the investors in these ventures had such knowledge of the coal business that they could make an independent evaluation of the prospect of making a profit. Of course, all or many of them may have hoped to make a profit, even though it might not have been reasonably feasible,

We are not convinced that Finkel's primary objective in forming these partnerships was to make a profit for the partnerships from mining and selling coal. Finkel had had experience in syndicating real estate ventures (how successfully, we do not know), but he had had no experience in the coal business. Without such experience or further investigation, it is doubtful that he could have evaluated the possibility of making a profit from these properties with any degree of accuracy. If he had any real concern about making a profit, he made no valid effort to inquire into many factors that would have a decided bearing on whether these properties could be operated at a profit. Finkel's primary objective is suggested by his first move which was to engage the service of Beck, an attorney, to determine what tax advantages could be derived from operating coal properties in limited partnership form and how it could be done to attract investors.[59]

Finkel apparently looked at the prospects of a coal mining venture in the same light that it was presented to the potential investors, i.e., from a strictly superficial standpoint. He located the Bell County property and found it was for sale. But purchasing the property for the partnerships would not provide the tax benefits he needed to sell the venture, so he had Kaplan, a friend, buy the property and lease it to the partnerships so they could get royalty deductions. He accepted the unverified report of Hagy as to the amount of minable coal there was in the property, as well as Hagy's loose estimates that the coal could be mined for $13 per ton and sold for $16 per ton. If a royalty of $2 per ton of coal were paid, this would leave a profit to the partnership of $1 per ton and if more than 788,000 tons of coal were mined and sold, the partnerships would recover their investments, and possibly make a profit. However, such an evaluation was either very naive or was made only for the purpose of selling partnership interests.

Opening up a coal mine or even a strip mining operation requires a large amount of capital and, as discussed later,

---

but all of them invested with the principal thought in mind that they would obtain rather sizable tax deductions.

[59]While there are some differences in the documents pertaining to the Bell County partnerships and the Knox County partnerships, the activities associated with both are similar, so while our discussion is directed primarily at the Bell County partnerships, it is applicable to both.

Finkel saw to it that the partnerships had very little capital. Operating a coal mine profitably requires not only minable seams of coal but also miners and machinery to mine and remove the coal from the mine or the face, water and electricity, access roads to and from the entries, tipples and cleaning plants that are nearby and are capable of handling the coal, good roads or railroads from the tipple or cleaning plant to the point of distribution, and customers who will buy the coal at a price that will yield a profit. It must also be recognized that there may be strikes, mine closings because of weather, safety hazards, or other reasons, and that there may be variations in the costs of mining and transporting the coal, and the selling price of coal. While Finkel did plan to have the coal mined by contract miners, he had no assurance that either regular or contract miners were available before the partnerships entered into the leases. So far as we can determine from the record, very little consideration was given to any of the above factors or the costs thereof for the actual mining of the coal. Nor was any effort made to verify the quantity or quality of the coal by core drilling or other exploratory means. We do not believe that either Finkel or the investors would have entered into these ventures with a primary objective of making a profit from producing coal without further investigation into the prospects for mining and selling the coal at a profit.

Furthermore, we note that the partnerships were structured in a manner that made it very difficult, if not impossible, to make a profit. Instead of securing the best possible terms he could for the partnerships to acquire the leaseholds, Finkel first determined what tax consequences he desired and then structured the deal accordingly. In other words, he worked backwards. For Amber, the first partnership formed, Finkel began soliciting orders for limited partnership interests by letter on June 4, 1976, wherein he promised a tax writeoff of 3 or 4 to 1. However, at that time, Amber had not even subleased the Bell County property and did not do so until July 27, 1976. When Amber then subleased the property, it agreed to pay enormous advanced royalties which would give the limited partners the promised tax writeoff of 4 to 1. As a result, Amber agreed to pay royalties for the right to mine a portion of the Bell County property far in excess of the fair market value of

the right to sublease the property. Whereas Kaplan leased the entire Bell County property for a $1-per-ton royalty and an advanced royalty of $100,000, Finkel obligated Amber to pay a $2-per-ton royalty and an advanced royalty of $788,000[60] for the right to mine approximately one-fourth of the Bell County property.[61] Yet, Finkel could have acquired the Bell County property for Amber on the same terms as Kaplan.

The other Bell County partnerships entered into identical subleases with Kaplan. Thus, all the Bell County partnerships obtained the tax writeoff of 4 to 1, but at the cost of paying enormous royalties and advanced royalties.

The Knox County partnerships were similarly structured. Originally, each Knox County partnership agreed to pay a royalty of $2.87 per ton and an advanced royalty of $832,300 ($416,150 for Silver). These amounts were clearly excessive since Kaplan had recently purchased the property outright for $140,000, and Finkel could have acquired the Knox County property on the same terms as Kaplan. It is obvious that the reason the partnerships agreed to pay the highly inflated amounts was to generate large tax writeoffs. This became even more obvious when the Knox County partnerships amended the proposed subleases to require an advanced minimum royalty of $832,000 *each year* of the 7-year-lease term just to meet the requirements of the new proposed regulation. Clearly, these partnerships were structured solely with tax avoidance in mind.[62]

---

[60]The $788,000 figure was used by Amber because Beck believed this was close to the maximum advanced royalty that the Internal Revenue Service would allow. See note 13 *supra*.

[61]Finkel was obviously aware of how much Kaplan paid to lease the Bell County property since Finkel's attorney, Beck, handled both the negotiations for Kaplan's leasing the property and Amber's subsequent subleasing of the property from Kaplan. Finkel's explanation of why he brought Kaplan into the transactions was that he felt obligated to Kaplan for some reason—but this was not an obligation of the partnerships. Certainly, Finkel could have bought or leased the properties for the partnerships directly from the owners had he been primarily interested in making the most profit possible for the partnerships. Kaplan, or his corporations, received a very sizable amount of cash from the partnerships and we are not informed of what services he performed for the partnerships.

[62]We further note that the advanced minimum royalties agreed to be paid by the Knox County partnerships approximately equaled a royalty on 100 percent of the recoverable coal reserves underlying the property. Therefore, the Knox County partnerships were placed in a position whereby they were required to mine every ton of the estimated recoverable coal reserves to recover the advanced minimum royalty.

In addition to obligating the partnerships to pay excessive royalties, Finkel caused the partnerships to pay out the majority of their paid-in capital to either himself, his wholly owned corporation, Beck, Kaplan, or to offeree-representatives. As a result, the partnerships had a minimal amount of working capital to mine the property. Furthermore, these amounts paid out were done so based upon the amount of money Finkel thought he could raise and the amount he, Beck, and Kaplan wanted to get out of the deal. The concern here was not in making a profit through mining coal, but to extract money through selling tax writeoffs.

We also note that the total lack of investigation done by Finkel supports our conclusion that the partnerships were not engaged in an activity for profit. Finkel had no prior experience in coal mining, yet he formed eight limited partnerships without knowing the cost of mining, the availability of miners, and, in general, without any awareness of whether the coal could feasibly be mined. Although Finkel testified that he relied on Hagy's advice that the property could be mined at a cost that would lower its selling price, Hagy flatly contradicted this testimony.

Our conviction that the primary objective of the partnerships was to provide tax deductions rather than earn a profit is buttressed by the large nonrecourse notes given by the partnerships. The provision for giving these notes ostensibly as payments of advanced royalties made no sense nor had any purpose other than to provide the limited partners with tax deductions, which in turn made it easier for the promotors to sell the partnership interests. Petitioners have given us no valid non-tax reason why these large nonrecourse notes should have been required either from the partnerships' viewpoint or the lessors' viewpoint. The notes did not cover a minimum annual royalty (although Beck made a last minute effort to modify the Knox County leases to provide that notes for the full amount should be given each year); if no coal was produced, the lessor could not collect on the notes. On the other hand, if coal was produced, the leases provided that $2 should be paid to the lessor on each ton of coal mined, so there was no need for the notes. It would have been foolhardy for any lessee to actually obligate itself, in advance of even any preparation to mine, to pay a tonnage royalty on every ton of

coal that the consultants estimated might be mined from the property. It is obvious that the only purpose for the advanced royalty notes was to support a deduction for advanced royalties paid or accrued for tax purposes. Nothing was ever paid on the notes and it was not intended in reality that anything would be paid on them. The tonnage royalties would have been the source of any payments for the coal mined, not the notes. No interest was paid on the notes. The notes were window dressing, and were not payments of royalties. See *Wing v. Commissioner, supra.*

The activities of the general partners subsequent to the execution of the leases also belie any real profit objective. Since the partnerships had insufficient working capital to mine the property, Finkel represented that contract miners would be hired to mine the property. Yet at the time Amber was formed no contract miners had been hired, and Amber found that none were available. Despite this, Finkel went ahead and syndicated seven additional partnerships, knowing that he had no means to mine the properties. Furthermore, there is nothing to indicate that Finkel made an effort to find out what contract miners would have mined the property for if any contract miners had been available. Without this information, Finkel could not determine whether the properties could be mined at a profit. Hagy, Finkel's consultant, testified that he could not tell Finkel how much it would cost to mine the properties without doing additional investigation, which he was not authorized to do. No exploratory work, such as core drilling, was done to determine where and in what quantities there was minable coal. About the only efforts to actually mine the properties were made after Finkel learned that the Internal Revenue Service was investigating these partnerships and that it would be better if some mining activity were underway. In September of 1977, the partnerships entered into a contract with a contract miner to mine a total of 50,000 tons or about 4,250 tons of coal per partnership. It is not clear whether any coal was actually mined under this contract, but if so, there was not much, and the contract was terminated. In 1979, the partnerships entered into a contract with another contractor to mine the coal, and the partnerships paid a total of $50,000 to this contractor to initiate exploration on the

property. This contract was later canceled and no coal was ever mined by the contractor.

We are not unaware that certain limited partners testified that they had a profit motive when they invested in the partnerships. However, the above facts regarding the manner in which the partnerships were structured were all readily available to all the limited partners, and greater weight should be given to the objective facts than to the parties' mere statement of intent. *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979). Furthermore, we think it is abundantly clear that looking at this from the partnership level and taking into account all the facts and circumstances, that the partnerships did not enter into the coal-mining activity for profit.

In summary, we conclude that the tax avoidance considerations so overwhelmingly pervaded the formation and operation of these partnerships in comparison to any profit making objective that the partnerships and petitioners lacked the requisite profit motive to be allowed the advanced royalty and advanced minimum royalty deductions sought. See *Fox v. Commissioner, supra*; *Flowers v. Commissioner, supra*; *Brannen v. Commissioner, supra*; *Wing v. Commissioner, supra*. It could be ascertained in advance that Kaplan would receive in cash far more than he was obligated to pay for the properties, that Finkel would receive in cash over $400,000 in excess of the amounts he invested, that Beck would receive about $200,000 in cash as attorney fees, and that the offeree-representatives would receive a total of about $191,000 in cash, but there was no assurance, or even a bona fide expectation, that the investors would recover anything except their tax savings.

Having concluded that the partnerships were not engaged in business with a primary objective of making a profit, and are therefore not entitled to royalty deductions, we need not decide whether the nonrecourse notes, or what part of the cash royalties paid by the partnerships, qualify as royalties to permit their deduction under the regulation prior to amendment. Nor need we decide whether the cash and notes given by the partnerships as advanced royalties qualify as annual minimum royalties under this regulation, as amended.

## 2. *Management Compensation*

The next issue is whether the Bell and Knox County partnerships are entitled to a deduction for amounts paid to their general partners. Each Bell County partnership paid $50,000 to its general partner (Finkel Investment Service) and each Knox County partnership paid $70,000 to its general partner (Finkel), except Silver which paid $35,000.

Petitioners contend that the amounts paid the general partners were ordinary and necessary business expenses deductible under section 162(a). Respondent counters that since the partnerships were not engaged in a trade or business, they are not entitled to the deductions under section 162(a), or alternatively, if the partnerships were engaged in a trade or business, that the fees paid are organizational or syndication fees that must be capitalized.

In order for the partnerships to be entitled to the deduction for amounts paid to their general partners, the requirements of section 162(a) had to be met. *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Our holding that the partnerships were not engaged in a trade or business is dispositive of this issue.

Furthermore, the services performed for the partnerships by the general partners were in connection with the organization of the partnerships, the acquisition of leases, and preoperational expenses, which would have to be capitalized. *Estate of Boyd v. Commissioner*, 76 T.C. 646 (1981); *Kimmelman v. Commissioner*, 72 T.C. 294 (1979); *Cagle v. Commissioner*, *supra*.

Accordingly, we sustain respondent on this issue.[63]

## 3. *Accounting Fees*

The next issue is whether the partnerships are entitled to a deduction for amounts paid to an accounting firm for the preparation of its income tax returns. Petitioners contend that the amounts constitute an ordinary and necessary expense deductible under section 162(a). Respondent counters that

[63]Due to our holding, it is unnecessary to decide whether the fees paid to the general partners were syndication or organizational fees, deductions of which are disallowed under sec. 709(a) of the Code.

since the partnerships were not engaged in a trade or business, they are not entitled to the deduction.

Again, our earlier holding that the partnerships were not engaged in a trade or business precludes the partnerships' claiming the deduction under section 162. However, under section 212(3), there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred in connection with the determination, collection, or refund of any tax. Expenses paid in connection with the preparation of tax returns qualify as expenses paid for the determination, collection, or refund of a tax. See sec. 1.212(1), Income Tax Regs. The accounting fee paid by the partnerships was paid to Arthur Anderson for services rendered in completing their 1976 Federal income tax returns and thus such amounts would be deductible under section 212(3).

Although section 212(3) applies only to individuals, under section 702, each partner, in determining his income tax, is required to take into account separately his distributive share of certain partnership items. Section 702(a)(7) includes "other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary." Section 1.702–1(a)(8)(i), Income Tax Regs., provides that "Each partner shall take into account separately, as part of any class of income, gain, loss, deduction, or credit, his distributive share of the following items: * * * nonbusiness expenses as described in section 212." Therefore, the individual partners are entitled to the deduction under section 212(3). Compare *Seese v. Commissioner*, 7 T.C. 925 (1946), and *McFarland v. Commissioner*, T.C. Memo. 1957–52, which are distinguishable in that they were decided under section 23(a)(2) of the 1939 Internal Revenue Code, and prior to the issuance of section 1.702–1(a)(8)(i), Income Tax Regs.

We hold for petitioners on this issue.

## 4. Interest Deductions

The fourth issue is whether the partnerships are entitled to certain interest deductions. The partnerships claimed deductions for accrued interest on the nonrecourse notes given to National and Georgia to pay the advanced royalties.

Respondent asserts that the accrued interest is not deductible because the notes were shams, were contingent in nature,

and unreasonably exceeded the fair market value of the underlying leases. Petitioners claim otherwise. We agree with respondent that the notes were shams and that the accrued interest on such notes is not deductible under section 163(a)(1).

Section 163(a) provides that "there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." "Interest" is the amount which one has contracted to pay for the use of borrowed money. *Old Colony Railroad Co. v. Commissioner*, 284 U.S. 552 (1932). In order for interest to be deductible under section 163(a), it must be paid on genuine indebtedness. *Knetsch v. United States*, 364 U.S. 361 (1960); *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir., Mar. 3, 1982). Where transactions lack substance and are entered into solely to form the basis of a tax deduction, they need not be recognized. *Battelstein v. Internal Revenue Service*, 611 F.2d 1033, 1035 (5th Cir. 1980); *Goodstein v. Commissioner*, 30 T.C. 1178 (1958), affd. 267 F.2d 127 (1st Cir. 1959). Whether the nonrecourse notes created a bona fide debt is a question of fact, the burden of proof of which is on petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure.

We find that the nonrecourse notes entered into by both the Bell County and Knox County partnerships lacked substance and were entered into solely to form the basis of tax deductions, and, accordingly, the accrued interest on such notes is not deductible.

As previously noted, there was no reason for issuance of the notes by any of the partnerships[64] except to support claims for prepaid royalty deductions. The amounts of the advanced royalties called for in the notes were far in excess of the amounts for which the entire properties were acquired by Kaplan at about the same time the leases were being drafted. We believe the partnerships would have paid the royalties when, as, and if coal was mined, but we do not believe the parties ever intended to pay either the notes or interest thereon if coal was not mined. This is supported by the record—no payments of either principal or interest had been made on any of the notes up to the time this case was tried. In

---

[64]It seems that the notes that were supposed to be issued by the Knox County partnerships for years 2 through 7 of the leases were never even issued.

fact, it was evident that the partnerships would have no cash to pay interest unless coal was mined and sold. Even under the terms of the leases, the notes would not be in default if no payments were made until 48 months after they were executed. The partnerships received nothing upon which "interest" would ordinarily be paid. Furthermore, during the years 1976 and 1977 the notes were obviously contingent, and it was indeed questionable whether any principal or interest would be paid, or if interest was called for, how much. No part of the interest due on any of the nonrecourse notes was properly accruable in 1976 or 1977. See *Fox v. Commissioner*, 80 T.C. 972 (May 18, 1983); *Flowers v. Commissioner*, 80 T.C. 914 (May 16, 1983); *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982), and *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982), revg. and remanding on other grounds *Brountas v. Commissioner*, 73 T.C. 491 (1979); *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981).

Accordingly, we hold that the deductions claimed by the partnerships for accrued interest are not deductible in either 1976 or 1977.

## 5. Offeree-Representative Fees

The fifth issue is whether the partnerships are entitled to a deduction for amounts paid for offeree-representative fees. The Bell and Knox County partnerships required each potential limited partner to have an offeree-representative assist him in evaluating the risk of investing in the limited partnerships. The offeree-representative selected by each potential investor was required to have such knowledge and experience in financial, tax, and business matters to enable him to evaluate the risks of investing in one of the partnerships. If the potential investor decided to invest in the limited partnerships, the partnership paid the offeree-representative 10 percent of the amount the investor invested.

Petitioners assert that the amounts paid to the offeree-representatives by the partnerships are deductible under section 212(3) as amounts paid for the collection, refund, or determination of any tax, alternatively, under section 162(a) as an ordinary and necessary business expense. Respondent counters that such amounts do not constitute deductible expenses under section 212(3) or 162(a), and, alternatively,

that such amounts must be capitalized. We agree with respondent.

The amounts in question were paid by the partnerships ostensibly for services the offeree-representatives rendered not to the partnership, but rather to the various individual limited partners in explaining the financial and tax ramifications of investing in the partnerships. It is clear that this expense was not an ordinary and necessary expense of the partnerships, but rather was an expense of the individual limited partners. As such, the partnerships are not entitled to a deduction for such amount under section 162(a). Furthermore, our earlier holding that the partnerships were not engaged in a trade or business precludes the deduction under section 162(a).

Petitioners also contend that a partnership is a conduit for tax purposes and that expenses paid for or on behalf of a partner by a partnership are attributable to that partner; therefore, the offeree-representatives' fees paid for or on behalf of the limited partners for financial advice by independent offeree-representatives were properly deducted on Form 1065 as either payment for investment advice for the limited partners under section 212, or as ordinary and necessary business expense deductions in 1976 under section 162.

Petitioners do not illucidate on this argument in their brief nor does respondent discuss it. Furthermore, petitioners have failed to present sufficient evidence to show just what services were rendered by the offeree-representatives. These fees were claimed as deductions by the partnership so it would not appear that they should be classified as the itemized deductions referred to in section 703(a)(2)(E) of the Code. In any event, petitioners have failed to carry their burden of proving that these fees qualify as investment expenses deductible by the partners under section 212.

## 6. Tax Advice

The final issue is whether the partnerships are entitled to a deduction for the portion of the attorney fees paid to Beck which was allocated by Beck as amounts paid for tax advice.

Each of the partnerships paid Beck $12,000 for services he rendered as the partnerships' attorney. Beck allocated $2,000 of his fee for the preparation of partnership agreements and organizational work. Beck allocated the remaining $10,000 of

his fee to the rendering of tax advice to each partnership and discussing tax ramifications and offering tax advice to offeree-representatives, as well as explaining the economics and business nature of the transactions.

Petitioners assert that to the extent the fees paid to Beck are allocable to tax advice ($10,000), the partnerships or the partners are entitled to a deduction under section 162(a) or section 212(3). Respondent contends that the fees paid to Beck were a syndication or selling expense and must be capitalized.

Section 709(a) provides that no deduction shall be allowed to a partnership or to any partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership. Expenses connected with the issuing and marketing of interests in the partnership are syndication expenses which must be capitalized. Sec. 709(b). Therefore, we must determine whether the amounts paid to Beck were incurred to promote the sale of interests in the partnerships, rendering them nondeductible.

Initially, we note that the services rendered by Beck were all performed for the partnerships prior to their formation. Beck prepared the tax opinion letter which accompanied the offering memorandum sent to potential investors, and met with offeree-representatives to explain the tax ramifications of investing in the partnerships.

We think it is clear that the fees paid to Beck, even to the extent he allocated them to tax advice, were incurred to promote the sale of the partnership interests and must therefore be capitalized. The tax opinion letter was an integral part of the offering prospectus and was certainly included therein to facilitate the sale of partnership interests. Indeed, we doubt that any investor would have purchased interests in the partnerships had there not been representations made regarding the tax advantages of doing so. Beck's meeting with the offeree-representatives and potential investors to explain the financial and tax ramifications prior to their investing in the partnerships was only a continuance of the efforts to sell partnership interests. See also *Flowers v. Commissioner, supra.*

In addition, we note that the partnerships themselves incurred the expense prior to their formation. The majority of the services appear to have gone into the preparation of the tax opinion letter which informed potential investors in

general of the tax consequences of investing in the partnerships. It does not appear that the tax advice was directed to the individual needs of the various investors, but rather was incurred by the partnerships solely as an aid in selling the partnership interests.[65] Thus, we hold that the expense was a partnership expense incurred in selling partnership interests and is not deductible.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

*Supplemental Opinion appears at 81 T.C. 949 (1983).

[65]We note that this is not a situation where the individual partners incurred the expense for their own account prior to entering into the investment to learn the tax ramifications of making such an investment. See and compare *Collins v. Commissioner*, 54 T.C. 1656 (1970).